Whitaker, Judge,
delivered the opinion of the court:
This is a suit for disability retired pay. Plaintiff invokes the jurisdiction of this court on the ground that the determination of the Secretary of the Army, that plaintiff was not disabled to “a degree that would preclude the performance of military duty”, was arbitrary and capricious.
It is not amiss to again call attention to the fact that jurisdiction to determine an officer’s eligibility for retirement for physical disability is conferred on the Secretary of the Army, acting through a Physical Evaluation Board, in the first instance, and the boards set up by the Secretary to *413 review the action, of the Physical Evaluation Board, in the second instance, and, finally, by the Secretary himself. We have no jurisdiction in the matter at all, unless the Secretary’s action was' arbitrary or capricious or otherwise unlawful. That, with us, is our initial inquiry: Was his action arbitrary or capricious or otherwise unlawful. If our answer is no, that is the end of the matter; the Secretary’s determination stands.
Can we say that this action was arbitrary? A brief recital of the facts will demonstrate that we cannot.
Plaintiff was born January 18, 1894. After intermittent service in the National Guard and the United States Army, from September 10,1910, to March 31,1941, he entered upon active service in the Army as a career, on March 3, 1941, at the age of 47 years. Having entered active service in the United States Army Reserve as a captain, he attained the rank of colonel by the time he was released from active duty on March 17, 1954.
During his Army career he had several accidents which temporarily hospitalized him, and beginning in 1947 he began to have some trouble with an ulcer, and with hypertension, largely due to the tension under which he worked and his unusual fidelity to duty, from one or both of which causes he was hospitalized from time to time.
On September 24, 1953, he entered Fort Riley General Hospital suffering from an ulcerated condition and also from high blood pressure. He was returned to duty November 21,1953. Because at that time he was nearing the age of 60 years, when he would qualify for longevity retirement, he was given a pre-retirement physical examination in 1953. Upon review thereof, the office .of the Surgeon General recommended that he be hospitalized for appearance before a Board of Medical Officers and, if warranted, before a Physical Evaluation Board. Accordingly, he was readmitted to the Fort Riley General Hospital, where he was examined, from January 5,1954, to January 15, 1954. Upon admission his blood pressure was 190/100, his liver was “mildly abnormal”, and he had a duodenal ulcer, which was inactive, without obstruction. He was also suffering from arthritis. The hospital board recommended that he be sent before a *414 Physical Evaluation Board, and this was done. This board found that plaintiff’s combined percentage of disability was 30 percent, comprised of 20 percent arthritis, and 10 percent for his ulcer; nothing was allowed for either his liver condition or his high blood pressure, and he was found physically unfit to perform the duties of his office.
The Physical Evaluation Board stated that “the principal causes for retiring this officer are his ulcer, duodenum, inactive, which will recur under constant pressure of work, and his arthritis which is a constant source of discomfort and interferes with the full performance of his duty. Inasmuch as there is no specific treatments for these diseases, it is felt that continuation on active duty is not to the best interests of either the officer or the military service.”
The Secretary of the Army had set up the Army Physical Review Council to review the findings of the Physical Evaluation Board. This Council, having reviewed the foregoing findings, on February 12,1954, found as follows:
The evidence of record does not reveal the presence of any disability of a degree which would preclude the performance of active military duty. Member is considered to be physically fit.
Plaintiff was notified of the findings of the Army Physical Review Council, and was informed of his right to submit a rebuttal statement. After receipt of the rebuttal statement, the proceedings of the Physical Evaluation Board and the Army Physical Review Council were transmitted to the Army Physical Disability Appeal Board, which had also been set up by the Secretary to review actions of the two •lower boards above mentioned. This Army Physical Disability Appeal Board, on March 2, 1954, stated that it concurred in the findings of the Army Physical Review Council. Thereafter, the action of the Army Physical Review Council and the Army Physical Disability Appeal Board were approved by the Secretary, and plaintiff was released from active duty on March 17, 1954, not due to physical disability.
On May 12,1954, plaintiff applied to the Army Board for Correction of Military Records, submitting to it the complete medical history of his case, and a report on his condition made by the United States Naval Hospital at Corona, *415 California, on April 30, 1954, subsequent to plaintiff’s release from active duty on March 17,1954.
On November 16,1954, the Army Board for Correction of Military Records requested the comment and opinion of the Surgeon General, calling to his attention the proceedings and findings of the Army Physical Evaluation Board, the Army Physical Review Council, the Army Physical Disability Appeal Board, and the Corona Naval Hospital. In reply, the Surgeon General stated that a review of the records did not show that plaintiff’s retirement for physical disability was warranted. Following this, the Adjutant General, by direction of the Army Board for Correction of Military Records, notified plaintiff that the evidence submitted did not justify a formal review of his case, in the absence of additional evidence. Apparently, no further evidence was submitted and no further action was taken by the Army Board for Correction of Military Records.
We think the Trial Commissioner has properly evaluated the case in his finding 29, which reads:
On the basis of the evidence submitted to the Army Physical Review Council, the Army Physical Disability Appeal Board, and the Army Board for Correction of Military Records, it cannot be found that the adverse action of any of such board on plaintiff’s case was arbitrary or not supported by substantial evidence, even though reasonable minds might have differed as to the proper determination of plaintiff’s case, as evidenced by the favorable action of the Disposition Board of medical officers and the Physical Evaluation Board.
We agree with the Trial Commissioner. On the one hand, we have the finding of the Army Physical Evaluation Board that plaintiff was unfit for duty, but its report shows that the evidence to support the finding was meager. If unfit, it was a mild case of unfitness. As against this, we have the finding of the Army Physical Review Council, the Army Physical Disability Appeal Board, the Surgeon General, and the Army Board for Correction of Military Records. This does not show arbitrary action. We cannot find that the action of the Secretary in denying retirement for physical disability was arbitrary or capricious or not supported by substantial *416 evidence. This being true, we have no jurisdiction to inquire further into the matter.
Plaintiff was a fine officer and rendered service to his country beyond the call of duty, but we cannot say that the Secretary was unjustified in finding that he was not entitled to retirement for physical disability.
Plaintiff’s petition will be dismissed.
It is so ordered.
Davis, Judge; Duerme, Judge;- Laramore, Judge; and Jones, OMef Judge, concur.
EINDINGS OE EACT
The court, having considered the evidence, the report of Trial Commissioner Eoald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, a citizen of the United States and a resident of Garden Grove, California, was born January 18,1894. In 1910 he enlisted in the California National Guard and performed active duty for nearly 2 years from September 10, 1910, to September 1, 1912. He enlisted and served in the Mexican Border Campaign from June 25,1916 to August 29, 1917. He enlisted in the U.S. Army on August 12,1918, and on December 6,1918, was honorably discharged by reason of demobilization. He became a captain in the National Guard of the United States in 1937, and performed various tours of duty including the organization of a transportation truck company and instruction of military training in California high schools.
On March 3, 1941, he entered upon active service in the rank of captain. He intended to make the Army his career. He received various commissions and promotions and when released from active duty on March 17, 1954, had attained the rank of colonel in the United States Army Reserve. By reason of age and satisfactory military service, he was retired on March 31,1954, in the rank of colonel, Army of the United States, under sections 301 and 302 of the act of June 29,1948.
2. On February 20,1941, before entering on his extended period of active service, plaintiff was given a physical examination for induction purposes by three medical officers of the Army and was found to be normal in all respects.
*417 3. In an automobile accident on November 4,1941, plaintiff sustained injuries in line of duty as follows: (a) Wound, lacerated, transverse, right upper eyelid, severe, (b) Wound, lacerated, transverse, anterior surface, right knee, severe, (c) Fracture, simple, complete, 2nd and 3rd ribs, right, near sternal end. (d) Lung, left, atelectasis (collapse) of, acute. Pneumonia, lobar, left lung, upper and lower lobes, occurred secondary to the lung collapse. Plaintiff was hospitalized at the Fort Ord, California, Station Hospital until December 1, 1941. In a formal request for appointment of a line of duty board, the Chief of Surgical Service of that hospital advised plaintiff’s commanding officer that plaintiff’s injuries were not likely to result in partial or complete permanent disability.
4. On January 19, 1945, a varicose vein ligation was performed on plaintiff’s left lower leg at Camp Haan, California, Station Hospital, with no sequelae except a well-healed 2-inch scar, after which plaintiff had no varicose veins.
5. In August 1946, when plaintiff was post transportation officer at Fort Lewis, Washington, and when plaintiff was anxiously awaiting telephone reports from subordinate officers from Portland, Oregon, concerning progress of troop movements from Los Angeles, California, to Fort Lewis, plaintiff fell down a flight of stairs in his quarters while hurrying at night from an upper to a lower floor to answer the telephone. Plaintiff sustained a fractured right jaw, and injury to his right shoulder, collar bone, and right elbow, and severe bruises on his left hip and right groin. Plaintiff was not hospitalized, but received outpatient treatments at Madigan General Hospital.
6. In January 1948, when plaintiff was under orders for imminent departure by ship for an extended tour of duty in Japan, he suffered fracture of several ribs in an Army bus accident at Fort Lewis, Washington. Instead of seeking hospitalization, which he believed might result in cancellation of his orders, he bound his ribs with neckties and shortly thereafter boarded the ship, and during his overseas transportation received treatments from the ship doctor in the way of taping of his ribs.
7. Apart from the above-mentioned accidents and vein *418 ligation, plaintiff experienced no physical difficulties from the time of his entry on active duty in 1941 until 1947. In his Army examinations for physical fitness, conducted on May 3, 1943, and February 13, 1945, he denied any history of peptic ulcer, heart or joint diseases, and his blood pressure (reported respectively as 128/92 and 138/90), respiratory system, bones, joints and muscles, and genito-urinary system were found normal.
8. Plaintiff first experienced symptoms referrable to an ulcer condition in 1947 or 1948, but he made no official report or complaint of such symptoms until he was admitted to Letterman General Hospital in 1952, as hereinafter related. During the intervening years, plaintiff had occasional recurrences of “burning” in the pit of his stomach, nausea, distress from stomach acids rising to the throat, and tarry stools about every 6 to 8 months. During this period, he treated himself from time to time, as such symptoms recurred, with amphojel, milk of magnesia, antiacids, milk diet, and avoidance of greasy foods.
9. Commencing in 1947 plaintiff occasionally experienced symptoms referrable to hypertension in the way of spells of lightheadedness and flushing of the face. In his annual Army physical examination, conducted on January 23,1947, his blood pressure was found to be above normal at 142/100. Accordingly he was directed to undergo complete rest and return twice daily during the next 3 days for blood pressure tests which were recorded as follows: January 24, 130/90 and 128/88; January 25, 132/90 and 136/88; and January 26, 130/88 and 132/88. In subsequent annual examinations, like procedures were followed with respect to blood pressure tests with similar results. In the 1947 and subsequent examinations, electrocardiograph tests were conducted because of the blood pressure readings, and plaintiff’s heart condition was reported to be within normal limits.
10. Prior to his entry on extended active duty, plaintiff was a high school instructor in machine shop, mechanical drawing, and cadet military training, and before that a machinist in an oil refinery. In his military service thereafter, he served as a transportation officer, and his responsibilities were substantially greater than they had been *419 in civilian life, causing him to experience tension even though he had substantial staff and personnel assistance.
At Camp Haan, California, he served as transportation officer from 1944 to 1946, and had the responsibility for supervision of all commercial transportation and troop movements in and out of the post, including maintenance, dispatching, loading and unloading of trucks and railroad equipment. He had the same duties at Fort Lewis, Washington, from 1946 through 1947, with addition of harbor craft.
From Fort Lewis, Washington, plaintiff was ordered to Japan where he served from January 10, 1948, to June 24, 1950, first being assigned for 90 days to the task of coordinating the movement of coal out of mines in northern Hokaido by ship and rail to the main island of Honshu, then for a short time in the activation of the Yokohama motor command, and thereafter for about a year and a half in command of 11 Negro motor transport companies. A substantial number of such troops had become users of narcotics after contact with soldiers transferred from Korea to Japan, and plaintiff experienced severe command problems as a result thereof, being unable to take any leave during that period.
Upon plaintiff’s return to the United States, he was under orders allowing him a leave of absence of 30 days. However, the Korean War had commenced during his trip from Japan to San Francisco, and he voluntarily reported for duty, his leave orders were canceled, and he was assigned immediately first, as assistant port transportation officer, and then as port transportation officer, with responsibility for the movement of all freight to the Far East from the San Francisco Bay area and also from Long Beach. There was extreme pressure to attain utmost speed on these freight movements complicated by shortages of ships, trucks, and railroad cars. Plaintiff worked long hours in his office at Fort Mason, Calif., had a direct telephone line to authorities In Washington, D.C., and had supervision of 37 officers, including 5 colonels, on his staff.
11. Plaintiff’s arduous duties at Fort Mason, Calif., resulted in aggravation of his symptoms referrable to hyper *420 tension and an ulcer condition. His liglitbeadedness increased, be experienced flushing of his face and on occasions dizziness to the extent that he leaned against objects for support. His epigastric burning and nausea increased, and he remained on a milk diet much of his period of service at Fort Mason. For 3 months prior to May 1952, plaintiff occasionally experienced melena or tarry stools indicative of some degree of intestinal or gastric hemorrhaging. Plaintiff did not seek hospitalization until his wife threatened to report his condition to his commanding officer, when he went to the post dispensary from which he was ordered directly to Letterman General Hospital.
12. At Letterman General Hospital a diagnosis of peptic ulcer was made for which plaintiff was treated at such hospital for about 2 months from May to July 1952. Radio-graphic studies evidenced the existence of an active ulcer, but no transfusions were required, and plaintiff’s symptoms improved on therapy. Thereafter, and until he testified in this case in July 1960, plaintiff experienced tarry stools on not more than three occasions.
13. Upon his discharge from Letterman General Hospital plaintiff was given the choice of four new assignments, including the one he selected at Fort Riley, Kansas, where his duties were less arduous than they had been at Fort Mason.
. At Fort Riley, plaintiff continued to experience ulcer symptoms which prompted him to quit smoking in September 1952, after 30 years of the habit. In December 1952, he had a severe disturbance of his stomach which caused him to resort again to a milk diet, as he had been doing as often as about every 2 months.
Plaintiff continued to experience lightheadedness, and sustained another fall downstairs in his quarters at Fort Riley. Plaintiff also had recurring, but not constant, pain and stiffness in his lower back, hips, left knee, and elbows, and had difficulty in bending and in crossing his right knee with the left leg.
14. During the period from June 1, 1953, to September 24, 1953, plaintiff experienced sustained epigastric burning, nausea, and audible peristalsis, relieved only temporarily by sippy diet and antiacids, and on the latter date entered Fort *421 Eiley General Hospital and remained there until discharged on October 8,1953.
At this hospital, plaintiff was placed on a bland diet with medication. An entry of October 1 on his clinical record shows a gradual loss of midabdominal pain, but a prediction of return of burning pain when fasting. A G.I. Series (gastrointestinal radiographic examination) showed no abnormalities of plaintiff’s esophagus, stomach or duodenum. However, a diagnosis of duodenal ulcer was made, not necessarily inconsistent with negative radiographic findings.
On his entry into the hospital on September 24, plaintiff’s blood pressure was recorded as 174/110, and a funduscopio eye examination revealed narrowed, tortuous arterioles with nicking and slight venous enlargement. Hospital treatment resulted in reduction of plaintiff’s blood pressure to 130/80, normal for his age. A diagnosis of hypertension, vascular disease, benign, labile, was made.
The diagnosis of plaintiff’s condition was also that he had a degenerative joint disease, mild type, due to unknown cause, but incurred in line of duty, involving his lumbar spine and left hip. The' orthopedic consultation report stated that plaintiff had a 50-percent limitation of motion in forward and lateral bending and in left leg raising; 20 percent on right leg raising; inability to cross right knée with left leg; and stiffness of back muscles in the lumbar region. The orthopedic consultant referred to plaintiff’s disease as osteoarthritis of the lumbar spine and left hip. The radio-graphic report was that no significant abnormality was noted, but there was minimal spurring of plaintiff’s lumbar spine, not unusual for his age.
In this hospitalization, manual examination revealed some enlargement of plaintiff’s liver, and dye retention tests were conducted which were inconclusive because insufficient dye was used. The clinical record noted that such tests should be repeated, and thiamine was prescribed.
15. Following plaintiff’s discharge from the Fort Eiley hospital on October 8,1953, he received regular heat therapy ■treatments for arthritis and thiamine for his liver condition as an outpatient, and on November 19, 1953, was readmittéd to this hospital for a liver biopsy. It was then noted that *422 his liver was smaller than on the previous admission, but was still palpable. The biopsy was accomplished on November 20, 1953, and microscopic examination of the very small piece of liver tissue (1.8 cm. long and 2 mm. in diameter) revealed the following findings:
Microscopic: Sections reveal a portion of hepatic tissue which shows a fairly normal architecture. The central veins are distinct, slightly enlarged and the central liver cells contain a minimally increased amount of granular brown pigment. The portal areas are not unusual. They show a slight increase in cellularity. The most prominent feature is the presence of large, clear vacuoles scattered throughout the hepatic structure. These represent adult fat cells and show no distinct distribution. The biliary canaliculi are not unusual. No increased fibrosis is noted.
The diagnosis at that time was recorded as hepatomegaly, cause undetermined, incurred in line of duty.
Before commencement of the biopsy, plaintiff’s blood pressure was 158/105, and the post operative pressure during the next 24 hours varied between 150/100 and 142/90. It was noted that plaintiff had labile hypertension.
Plaintiff was given a diathermy treatment over the left sacral area of his back for pain radiating from his lower back down the medial side of his thigh, and the clinical record indicated daily treatments were prescribed. Plaintiff was returned to duty on November 21,1953.
16. Because plaintiff was nearing the age óf 60 years, when he would qualify for longevity retirement, he received a preretirement physical examination on November 23,1953, at Fort Kiley. His blood pressure was 140/90. An electrocardiograph test resulted in a finding that' his heart was normal. The clinical evaluation showed plaintiff had hypertensive vascular disease, benign, and degenerative joint disease, lumbar spine and left hip.
Upon a review of the report of plaintiff’s preretirement physical examination, the Office of 'the Surgeon General recommended hospitalization of plaintiff for observation, necessary treatment, appearance before a board of medical officers and, if warranted, before a physical evaluation board.
*423 17. On January 5,1954, plaintiff was admitted to the Fort Kiley hospital for evaluation of physical disabilities and until January 15, 1954, underwent thorough examination, observation and testing by the ward physician and other medical consultants.
Upon his admission, plaintiff’s blood pressure was 190/100, and his clinical record shows a gradual reduction during hospitalization to 188/90. It was noted that there was a very slight cloudiness of the eye lenses, and the eye grounds showed change in light reflex. A history of dyspnea, or dizziness, was noted on exertion, such as walking a flight of stairs. A low fat diet was prescribed. The hospital diagnosis was hypertensive vascular disease, benign, labile.
It was also recorded that plaintiff’s liver edge was by palpation found to be sharp and moderately tender. The diagnosis was liver, fatty metamorphosis, cause unknown, with the liver function mildly abnormal.
A radiograph test report showed no abnormalities of plaintiff’s esophagus, stomach or duodenum. It was noted on the hospital record that subjective ulcer symptoms persist and had been recurrent. The diagnosis was ulcer, duodenum, inactive, without obstruction.
Tests of plaintiff were conducted in the orthopedic clinic of the hospital because of his history and present complaints of pain and stiffness in the lower back, left hip and right elbow. The X-ray examination revealed some hyper-trophic changes in the bodies of lumbar vertebrae, described as consistent with age, but no abnormality of the coccyx or hips. It was noted that the coccyx was somewhat hyper-mobile, and further, that motion in the hips and back was good. The hospital diagnosis was arthritis, hypertrophic lumbar spine, left hip, right elbow and coccyx, with subjective complaints but mild objective findings.
18. On January 18, 1954, plaintiff’s case was considered at the Fort Kiley hospital by a Disposition Board of three medical officers, the president of which was Captain H. D. Tucker, M.C., the ward physician who actively supervised and participated in the testing and examination of plaintiff during his preceding hospitalization.
This board made the following diagnoses with respect to *424 plaintiff’s physical condition: (1) Liver, fatty metamorphosis, cause unknown, incurred in line of duty; (2) hypertensive vascular disease, benign, labile, incurred in line of duty; (3) arthritis, hypertrophic, lumbar spine, left hip, right elbow, coccyx, incurred in line of duty; and (4) ulcer, duodenum, inactive, without obstruction, incurred in line of duty.
The Disposition Board concluded and recommended that plaintiff be referred to the Physical Evaluation Board for retirement. In support thereof, this board stated as follows:
Lt. Col. Orvin N. Nichols was admitted to the U.S. Army Hospital, Fort Riley, Kansas on 5 January 1954 with the past history of having had an auto accident with traumatic pneumothorax and pneumonia and fractured ribs in 1941 and fractured right maxilla and left elbow in 1947. From about 1946 he states that blood pressure examinations had to be re-checked several times because of a tendency to hypertension. Beginning approximately 1949 he has had stiffness and pain in his low back and left hip which has, over the years, progressively become worse with some active limitation of function particularly in the left hip. Within the past few months he has noticed similar pain in his right elbow. From approximately 1949, and as the patient stated even earlier with much milder symptoms going-back to 1945, he has been troubled with digestive disturbances which in 1952 was diagnosed a duodenal ulcer at Letterman Army Hospital. Attacks of the digestive disturbances have been persistent to the present time. While in the Fort Riley Army Plospital in September, 1953 while being investigated for the symptoms of peptic ulcer he was found to have enlargement of the liver which has persisted, and liver biopsy was done on 20 November 1953, showing fatty metamorphosis of his liver, cause undetermined. The liver has remained enlarged and liver function studies done on the admission of 5 January 1954 revealed some impairment of liver function.
19. On January 21, 1954, plaintiff appeared before the Physical Evaluation Board (comprised of three Army officers, one of whom was a medical officer) duly appointed and convened to determine, under provisions of A.R. 600-450 and S.R. 600-450.5, plaintiff’s physical capacity for military service.
*425 Upon the basis of plaintiff’s records supplied by The Adjutant General, the testimony of plaintiff and of Captain Tucker, the medical officer previously mentioned in finding 18, and the records of plaintiff’s recent hospitalization and of the proceedings of the Disposition Board, the Physical Evaluation Board found that plaintiff was physically unfit to perform the duties of his office; that his disabilities were incurred while he was entitled to receive basic pay; that his disabilities were chronic enlargment of liver (fatty metamorphosis) cause undetermined; hypertensive vascular disease, benign, labile; hypertrophic arthritis of the lumbar spine, left hip, right elbow, coccyx; ulcer, duodenum, radio-logically inactive but with persistence of symptoms necessitating continuous diet; that all of such disabilities were of mild severity, were permanent, the proximate result of performance of duty, and permanently aggravated by and incurred in line of duty; and that plaintiff’s combined percentage of disability was 30 percent, being 20 percent for arthritis, 10 percent for the ulcer disease, and nothing for the liver and vascular conditions. The Board concluded, as follows:
The Board unanimously agrees that this officer does not meet the physical standards required for further military service and recommends that he be retired from the service with 30 per cent disability rating.
The medical history of Lt Col Nichols was reviewed and tests concluded that at the time the Board met he had a combination of ailments as listed by the Medical Board, but that the principal causes for retiring this officer are his ulcer, duodenum, inactive,, which will recur under constant pressure of work, and his arthritis which is a constant source of discomfort and interferes with the full performance of his duty. Inasmuch as there is no specific treatments for these diseases, it is felt that continuation on active duty is not to the best interests of either the officer or the military service.
20. On February 12, 1954, the Army Physical Eeview Council, according to a Disposition Form of that date, reviewed the proceedings of the Physical Evaluation Board, found only that plaintiff was physically fit, deleted all of the findings of the Physical Evaluation Board, the complete explanation of such action being stated as follows:
*426 The evidence of record does not reveal the presence of any disability of a degree which would preclude the performance of active military duty. Member is considered to be physically fit.
21. By letter dated February 15, 1954, plaintiff was duly advised of the adverse action taken by the Army Physical Beview Council and was informed of his right to submit a written rebuttal statement within 7 days after receipt of the notice.
Plaintiff did submit such a rebuttal statement in which he described as severe pain he was experiencing from arthritis, advised that the physical therapy he had received for 2 months at Fort Biley hospital had not cured him, that daily treatments by a heat lamp were relieving the pain sufficient to permit rest, but did not prevent recurrences, that the bed board prescribed at the Fort Biley hospital did not relieve his distress, that he had severe pain after sitting for more than an hour, that he could not bend or use his right elbow without pain, that he had conformed to a strict diet since treatment of his ulcer at Letterman General Hospital in 1952, but pains in the stomach and abdomen persisted and that he could not perform full military duty without further aggravation of his disability. He requested that if the Army Physical Beview Council did not act favorably, he be transferred to another Army hospital near his home for further observation, treatment, and medical evaluation.
22. Plaintiff’s rebuttal statement, together with his service file and the above-described records of proceedings of the Physical Evaluation Board and the Army Physical Beview Council, were on February 25,1954, transmitted to the Army Physical Disability Appeal Board, which endorsed on the transmittal form on March 2,1954, the statement that it concurred in the findings of the Army Physical Beview Council. Another endorsement shows that this action was approved by order of the Secretary of the Army on March 3,1954.
23. On March 4, 1954, telegraphic orders were transmitted by the Army from Washington, D.C., to Fort Biley to release plaintiff from active duty as ■ physically fit. On March 9, 1954, plaintiff was duly ordered released from active duty effective March 17, 1954, not due to physical disability.
*427 24. During plaintiff’s hospitalization immediately prior to his appearance before a Disposition Board and the. Physical Evaluation Board, his physical condition was on January 14, 1954, rated in accordance with the Army Profile Serial as P-4, U-2, L-2, H-l, E-l and S-l.
The letters in this rating system represent, “P” for physique or general physical capacity or stamina, “U” for upper extremities, “L” for lower extremities, “H” for hearing and ear defects, “E” for eyes, and “S” for neuro-psychiatric. The tested individual is graded or rated 1 to 4 after each letter according to his functional ability in that physical category. Number 1 represents above average efficiency with at most a minimal defect; number 2 represents average efficiency with a mild, nonprogressive physical defect; number 3 represents below average efficiency with a moderate physical defect; and number 4 represents non-acceptable efficiency with a marked physical defect.
Following receipt of information from Washington, D.C., that plaintiff was determined to be physically fit and should be returned to duty, a new entry of Profile Serial rating of plaintiff was on March 9, 1954, made on the Fort Riley hospital records as P-3, U-2, L-2, H-l, E-l and S-l. Captain Tucker was the medical officer who entered the rating in each case.
25. After plaintiff’s retirement for longevity on March 31,1954, plaintiff’s continued ulcer symptoms prompted him to go to the U.S. Naval Hospital, Corona, California, and request examination by the staff of that hospital as to his current physical condition, which was accomplished in a series of outpatient visits beginning April 16, 1954. The written report from the commanding officer to plaintiff, dated April 30, 1954, contained a detailed statement of plaintiff’s history of symptoms and treatment in the Army service, and contained the following statements concerning the results of the Naval hospital examinations:
The physical examination revealed a well developed, well nourished Caucasian male who did not appear acutely or chronically ill and was in no obvious distress. The blood pressure on the right arm was 160/96-90, and on the left 170/10L-94. The apixal rate was 84 per minute and rhythmic. The respiratory rate was *428 18 per minute. The face was ruddy and moderately flushed. Examination of the ocular fundi _ revealed changes of a Grade II Keith-Wagener retinopathy. Examination of the thorax revealed moderate increase in the AP diameter. The thoracic excursions, were normal. The lung fields were clear. Examination of the heart revealed no clinical evidence of cardiomegaly and the heart sounds were normal. The liver edge was palpable at the right costal margin; was non-tender and was not considered to be enlarged. There were no signs of congestive failure. There was moderate limitation of motion of the spine in all directions. Flexion of the spine was restricted to the point where he was able to place his finger tips ten (10) inches from the floor. There was moderate tenderness over the lumbo-sacral spine area. There was moderate restriction of movements with some discomfort on backward and lateral bending of the spine. There was moderate limitation of motion of the knee joints, particularly in flexion. Extremes in flexion produced moderate discomfort in the knee joints. There was moderate tenderness over the coccygeal area. The remainder of the physical examination was essentially normal.
An upper gastrointestinal x-ray series showed a marked deformity with evidence of chronic fibrosis and a small pseudodiverticulum formation in the mid-bulbar area. The deformity involved not only the duodenal bulb but also the gastric antrum. There was no evidence of obstruction. A roentgenogram of the chest showed an anomalous right 1st 2nd and 3rd ribs. The lung fields and cardiac silhouette were normal. Radiographic studies of the lumbar spine revealed osteoarthritic changes and there were x-ray changes suggestive of facet changes, most marked at L4 and L5. A fundu-scopic examination through dilated pupils confirmed the findings of a Grade II hypertensive retinopathy. This patient was seen in Orthopedic Consultation, and the following findings were noted: “Pain on movement of tip of coccyx; considerable tenderness on rectal examination. Slight tenderness over 1. sacroiliac intensified by rt. lateral bending of spine. Forward bending brings fingertips to within 10" of deck, hyperextension to 30° rt & 1 lateral bends 30° each. Motion of 1. hip causes pain. Flexion to 60° bilaterally with int. rotation, L. 10°, R 15°; ext. rotation L. 15°, R 20°. There is no pain, limitation of motion of rt. elbow at this time. X-rays show minimal sclerosis of apophyseal articulation L5. History and physical findings are suggestive *429 of early osteoarthritis with traumatic arthritis of coccyx. There is also a bony spur protruding from the proximal portion of the rt. olecranon.
26. Under date of May 12, 1954, plaintiff submitted his application to the Army Board for Correction of Military Records, requesting that he be retired under the provisions of section 15, act of June 16, 1942, with 30-percent physical disability, and that his retired monthly pay be 75 percent of his actual duty pay at time of retirement.
In support of his application, plaintiff submitted the complete medical history of his case, the report of the U.S. Naval Hospital, Corona, California, dated April 30, 1954, and the following statement of his summary of evidence:
The physical examination made by the U.S. Naval Hospital at Corona, California, clearly indicates that:
1. The blood pressure and a funduscopic examination confirm the findings of a Grade II hypertensive re-tinopathy.
2. An upper gastrointestinal x-ray series shows the effects of numerous ulcers with continued symptoms requiring constant medical attention and strict diet.
3. Radiographic studies of the lumbar spine revealed definite osteoarthritic changes suggestive of facet changes. The physical findings further indicate osteoarthritis with traumatic arthritis of coccyx.
4. Pain and restricted movement of the back and left hip indicate serious bone changes.
5. Pain on movement of right elbow when strain is involved indicates break down of bone structure in right elbow.
All of the medical disabilities considered by the Physical Evaluation Board at Ft. Riley, Kansas, and confirmed by medical examination at U.S. Naval Hospital at Corona, California, are disqualifying and are a basis for my retirement under the provisions of Section 15, Act of 16 June 1942, with not less than thirty per cent (30 %) physical disability.
The per cent of physical disability for the physical defects noted are well within provisions of the Veterans Administration’s schedule for rating disabilities. The provision of the above mentioned schedule was completely disregarded by the Physical Review Council.
27. By written request dated N ovember 16,1954, the Army Board for Correction of Military Records requested the com *430 ment and opinion of tbe Physical Standards Division, Office of the Surgeon General, as to whether plaintiff suffered physical disability warranting his retirement by reason thereof on March 17,1954, under the laws, rules, regulations, and policies in effect at that time. Attention was called to the proceedings of the Physical Evaluation Board, Army Physical Review Council, Army Physical Disability Appeal Board, and the Corona Naval Hospital report.
By letter dated November 19, 1954, the reply of the Office of the Surgeon General was that a review of plaintiff’s records did not substantiate that at the time plaintiff was separated from the service he had any disability of such nature or degree as to have warranted his retirement because of physical disability.
28. On December 16, 1954, the Army Board for Correction of Military Records directed that plaintiff be notified that on the basis of a thorough examination of his application and Army records, the Board had concluded that there was no justification for a formal hearing and review of the case.
By letter dated December 21,1954, The Adjutant General advised plaintiff that in accordance with the procedures established by the Secretary of the Army, the Army Board for Correction of Military Records could deny an application where a sufficient basis for a review had not been established, that review of plaintiff’s application, together with the information submitted by him, failed to reveal any evidence of error or injustice relative to his release from active duty on March 17, 1954, not by reason of physical disability, and that in the absence of additional evidence, no formal review by the Board or further action on his application was contemplated.
29. On the basis of the evidence submitted to the Army Physical Review Council, the Army Physical Disability Appeal Board, and the Army Board for Correction of Military Records, it cannot be found that the adverse action of any of such boards on plaintiff’s case was arbitrary or not supported by substantial evidence, even though reasonable minds might have differed as to the proper determination of plaintiff’s case, as evidenced by the favorable action of the Disposition Board of medical officers and the Physical Evaluation Board.
*431 30. After plaintiff’s release from active duty, plaintiff continued to experience bis previous symptoms and physical difficulties referrable to hypertension, arthritis, and ulcer condition. He was refused employment on several occasions prior to July 1954 because preemployment physical examinations revealed high blood pressure deemed disqualifying. At that time he was taking no medication for such condition. For about 2y2 years from July 1954 to October 1956 he operated an automobile service station, in which venture he failed, his stated reason being that he was unable to perform such work as changing tires, jacking up automobiles, and other work involving full use of his limbs. After passing a physical examination, he was employed and worked from October 1956 to April 1958 at the Doak Aircraft Company, doing at first work involving physical exertion, but thereafter reviewing drawings and making and assembling .small parts for experimental aircraft. On April 1,1958, plaintiff was employed as an instructor in mechanical drawing at the U.S. Disciplinary Barracks, Lompoc, California, in which capacity he was employed when examined at the Veterans Administration as hereinafter stated, and thereafter changed his employment to tool control work at the Cadillac Gauge Company, his current employment. Plaintiff lost very little time in his employment as the result of health conditions.
31. On March 11, 1958, plaintiff applied to the Veterans Administration at Anaheim, California, for disability evaluation and compensation benefits. He was given a series of examinations as an outpatient over a period of 3 or 4 days.
On August 6, 1958, the Veterans Administration awarded plaintiff a combined rating of 60 percent for service-connected disabilities, effective from March 11, 1958, based on individual ratings of 40 percent for arthritis, multiple joints; 20 percent for arteriosclerosis with hypertension; 10 percent for pleurisy, left, with residuals of fractured ribs; nothing for varicose veins; and nothing for duodenal ulcer and hepatitis. It was stated that there was service connection for arthritis and the gastrointestional, cardiovascular and chest conditions.
By latter dated August 7, 1958, the Veterans Administration advised plaintiff that he was eligible to receive $120 *432 per month from March 11, 1958, subject to Ms waiver of his longevity retirement pay. to that extent.
32. In 1957, plaintiff underwent a physical examination at Vandenberg Air Force Base, and for about a year received treatments for his ulcer condition as an outpatient.
From September 24, 1960, to October 17, 1960, he was hospitalized at the TT.S. Army Hospital, Fort MacArthur, Califorma. The clinical record contains a statement that for 2 months prior to his admission plaintiff had taken no medication and no particular diet for his ulcer condition, and had been asymptomatic except that 2 days prior to admission he had noted tarry stools without associated pain. He had taken medication for high blood pressure. His blood pressure was recorded as 90/70, probably at a time when he was hemorrhaging as hereinafter related. His liver could not be felt. There was no evidence of congestive heart failure. There was no localized tenderness in the abdomen. Chest X-ray was within normal limits, as was the electrocardiogram, and heart X-rays showed no evidence of cardiac enlargement. Gastrointestinal radiograpliic studies revealed deformity of the duodenal bulb with probable ulceration.
Because of gastrointestinal bleeding, plaintiff received transfusions of blood of 1,000 c.c. on September 27th and 2,000 c.c. on September 28, or a total of 6 pints of blood. During the first 5 days in the hospital, plaintiff passed tarry stools and was passing blood, but thereafter remained asymptomatic throughout his hospitalization. Surgical consultation was obtained and the possibility of surgery discussed with plaintiff. It was noted on the clinical record that because of plaintiff’s advanced age and reticence to accept surgery, although extremely cooperative, final decision regarding surgery was deferred for 60 days.
The final clinical diagnosis was ulcer, duodenum, without obstruction, with hemorrhage, and plaintiff’s condition on discharge was noted as improved.
33. Plaintiff had received treatments as an outpatient at the dispensary of the Fort MacArthur Hospital from late 1958 until Ms hospitalization there. Serpasil was regularly prescribed for his hypertension, and bellabarbitol and pro-banthine for his ulcer condition. On December 9, 1958, Ms blood pressure was recorded as 190/130 with subsequent *433 tests showing 140/96 on February 9, 1959, 140/86 on March 1, 1959, 140/90 on May 25, 1959, 130/84 on July 27, 1959, 140/90 on November 13,1959, 140/86 on December 14, 1959, 135/85 on January 15, 1960, 130/80 on February 15, 1960, 140/90 on April 19,1960,135/80 on July 11,1960, and 135/80 on August 18,1960.
34. From April 13,1960, until the date of his testimony in this case on July 22, 1960, Dr. Walter L. Bach served as personal physician for plaintiff. He had previously served for 15 years as a medical officer in the United States Navy Medical Corps. He prescribed serpasil for plaintiff’s hypertension, to be taken three times per day, and bellabarbitol for relief of gastric pain. He saw plaintiff on professional visits on April 13, May 8, and July 11,1960. By July 1960, Dr. Bach observed that plaintiff’s blood pressure had reached its lowest level at 135/80, considered by him to be nearly normal, whereas plaintiff’s blood pressure was 190/130 in December 1958 when he was first placed on steady treatments for hypertension at the Fort MacArthur Hospital dispensary. He testified that plaintiff had impaired hearing in both ears, but that the hearing disability was not due to hypertension. Dr. Bach testified that in his opinion an individual with disabilities diagnosed as stated in the Corona Hospital report, quoted above in finding 25, was not qualified for duty, that the diagnoses of the pertinent Disposition Board and Physical Evaluation Board were essentially the same as those of the Corona Hospital, and that his opinion based on the findings of those two boards was that plaintiff was not qualified for military service.
35. Colonel Benjamin H. Sullivan, M.C., Chief of the Gastroenterology Service, Walter Reed General Hospital, reviewed the records in evidence of plaintiff’s hospitalization at Letterman General Hospital, the records of proceedings before the Disposition Board and the Physical Evaluation Board in plaintiff’s case, and testified that in his opinion plaintiff was qualified for military service at the time of his release from active duty.
36. Colonel Harold E. Opsahl, M.C., Chief, Physical Standards Division, Office of the Surgeon General, reviewed the proceedings of the Physical Evaluation Board in plain *434 tiff’s case and testified that in his opinion plaintiff was fit for military service at the time of his release from active duty.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and his petition is therefore dismissed.