Per Curiam:
This case was referred to Trial Commissioner Franklin M. Stone with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Buie 134(h). The commissioner has done so in an opinion and report filed on July 27,1971. Defendant filed, then subsequently withdrew, a notice of intention to except to the commissioner’s report. On Septem *417 ber 29, 1971, plaintiff, fro se, filed a motion requesting that the court adopt the commissioner’s opinion, findings, and recommended conclusion of law.
The court desires to emphasize that its decision is not based on the grounds for relief argued and apparently inferred by plaintiff, as outlined in the last two sentences of finding 37 (b), intra. The court specifically rejects said argument and inference, and fully agrees with the views expressed by the commissioner in the first paragraph of finding 39, infra (appearing in Part VI, under the heading “Ultimate Findings and Conclusions”). The basis for the court’s conclusion, finding, and decision that plaintiff is entitled to recover to the extent hereinafter indicated, is as set forth and explained by the commissioner in the second paragraph of said finding 39.
Since the court agrees with the commissioner’s opinion, findings, and recommended conclusion of law, as hereinafter set forth, it hereby grants plaintiff’s motion that the court adopt the commissioner’s opinion, findings, and recommended conclusion of law and adopts the same, as supplemented by the preceding paragraph, as the basis for its judgment in this case without oral argument. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff, with the amount of recovery to be determined pursuant to Rule 131 (c) (2).
OPINION OP COMMISSIONER
Stone, Oonvmissioner:
Plaintiff, a former enlisted member of the United States Army, seeks to recover disability retirement pay and allowances from and including June 2, 1963, on the grounds that on June 1, 1963, when the Army terminated his disability retired pay because his name had been on the Temporary Disability Retired List (TDRL) 5 full years, he was then still deemed by the Army to be physically unfit to perform his military duties 'as a Master Sergeant by reason of physical disability (mental illness), with a disability rating of 30 percent, which had been made by the Army effective June 2,1958; that he should have been placed on the permanent retired list as of June 2, 1963, and paid disability retired pay on the basis of a permanent disability *418 rated at 80 percent disabling rather than being retained on the TDEL without pay from said date to July 18, 1963, when he was discharged from the Army, with entitlement simply to severance pay, as then being permanently unfit for further military service by reason of permanent physical disability with a disability rating of 10 percent; and that, in June 1963, when his disability retirement pay was terminated but his name retained on the TDEL without pay, as well as at the time of his discharge, he was in fact unfit for military service by reason of physical disability ratable at 30 percent disabling.
After a full review of the record and upon considering the respective requested findings of fact, objections thereto, and briefs submitted by the parties; the legal authorities cited by them; the applicable and controlling statutes; and the pertinent provisions of the Veterans Administration Schedule for Eating Disabilities in use at all times material herein, it is my opinion, based upon the following detailed findings of fact, ultimate findings, and conclusions, and conclusions of law, that plaintiff is entitled to recover disability retired pay from and including June 2, 1963, computed on the basis of 30 percent disability which is permanent, less the amount of severance pay paid to him by the Army following his discharge on July 18, 1963, and less any disability compensation he may have received from the Veterans Administration since that date.
Findings or Fact
I
1. Plaintiff was born in Chicago, Illinois, on May 3,1928. He entered on active duty as an enlisted man in the United States Army on January 15, 1947, attained the rank of Master Sergeant (E-7), and continued in active service until 1958, when he was placed on the Temporary Disability Re-tired List (TDEL). Thereafter, on July 18, 1963, he was removed from the TDEL and permanently discharged from the Army, with severance pay, because he was deemed physically unfit for active duty by reason of permanent physical disability rated at 10 percent under the Standard Schedule *419 for Rating Disabilities then in use by the Veterans Administration (VA Schedule), VA Diagnostic Code (VA Code) No. 9204 (partially quoted in finding 16 (e), infra). As of July 18, 1968, plaintiff was credited with 11 years, 3 months, and 2 days of active duty service; and 11 years, 4 months, and 9 days service for basic pay purposes.
2. (a) Plaintiff’s nervous condition first manifested itself on or about August 18, 1955, at which time he was in Officers’ Candidate School (OCS) at Fort Sill, Oklahoma. Plaintiff testified at the trial that he went to an Army physician who gave him some aspirin tablets and told him to go back to his barracks. No examination was made of him at this time. A report dated August 19, 1955, covering an interview an officer assigned to the Hygiene Service at Fort Sill had with plaintiff on said date reads in part:
This 27 yr old former M/Sgt * * * while in harrass-rnent situation yesterday felt urge to hit several upperclassmen and the off [sic] who were giving him simultaneous multiple commands — Instead he cried for first time since age 14. He feels he is not up to standards now but of some worth to Army and wants release from school and return to regular duty. He is just completing zero week. He feels he cannot be serious about this and make a go of it.
(b) Plaintiff withdrew from OCS and was assigned to duty with a Nike Missile Battalion at Quincy, Massachusetts. He continued to foe “troubled” and on or about September 27, 1955, he went to a civilian city hospital in Eochester, New Hampshire, and turned himself in. Hospital personnel recognized that something was wrong with plaintiff, and he was first taken to the Portsmouth Naval Hospital from which he was transferred to the Chelsea Naval Hospital, Chelsea, Massachusetts. After being hospitalized and treated at the last-named facility for about 12 days, he was transferred to the Valley Forge Army Hospital, Phoenixville, Pennsylvania.
3. A medical report dated April 13, 1956, reflects that special therapeutic procedures were followed with respect to plaintiff at the Valley Forge Army Hospital during the period October 1955 to March 1956, consisting of 19 electric *420 shock treatments between October 14, 1955 and February 9, 1956; 68 insulin coma treatments between November 22, 1955 and March 5, 1956; and thorazine treatments. He also received specialized treatments in the form of open and closed neuropsychiatric ward care during this same overall period. Plaintiff was discharged from said hospital for return to active duty on April 13, 1956, at which time his condition was diagnosed in pertinent part as follows:
* * * Schizophrenic reaction, n.e.c., [not elsewhere classified] acute, severe; manifested by suspiciousness, auditory hallucinations, flat affect, increased psychomotor activity, and all sorts of delusions. Predisposition: Moderate; unhealthy interpersonal relationships with parents. Stress: Moderate, OCS. Condition: Improved; in remission. Impairment: Mild. * * *
Plaintiff was given a revised Army physical profile rating[1] of P-1, U-1, L-1, H-1, E-1, and S-2.
4. (a) After plaintiff’s discharge from the Valley Forge Army Hospital, he was assigned to duty at Fort Benning, Georgia, and then transferred to Eilson Air Force Base (AFB), Alaska. He was not given a followup examination after being discharged from the Valley Forge Army Hospital. Shortly after being returned to duty at Eilson AFB, he began experiencing guilt feelings, became depressed, and on March 10, 1951, he turned 'himself in to the Military Police, and was sent to Ladd AFB, Alaska. He was then transferred to the U.S. Air Force Hospital, Elmendorf AFB, Alaska.. After receiving treatment there, he was transferred and admitted to Letterman Army Hospital, San Francisco, California, on April 4, 1957. The hospital clinical records contain a narrative summary which discloses that a physical examination was made of plaintiff at the last- *421 mentioned hospital on April 11, 1958. The summary reads in part:
course in hospital: Patient was initially admitted to the Open Ward, but rapidly became agitated, confused, withdrawn and was placed on the Closed Ward shortly after admission. Subsequent to this, he was seen in supportive psychotherapy and in multiple therapy sessions for a number of months, during which time the patient manifested various symptoms of his illness.* * * For the past 2½ months the patient has shown considerable improvement and his mental status at the present time is approximately that of upon admission to this hospital. Because of the patient’s intelligence and ability to verbalize, he was taken on as a teaching case in intensive psychotherapy.
diagnosis :
* * * Schizophrenic reaction, n.e.c., chronic, severe, in partial remission; manifested 'by delusions, hallucinations, withdrawal, agitated behavior. * * * Predisposition: Severe * * * Impairment: Severe for further military duty. * * * profile : 111 314*
*****
*(This diagnosis corresponds to VA Code #9004, with definite impairment for civilian social and industrial adaptability.)
recommendation : That * * * [plaintiff] appear before a Physical Evaluation Board. [PEB]
(b) A report of another examination made of plaintiff at said hospital on April 14,1958, by the same physician who examined him on April 11, 1958, discloses that plaintiff’s condition was diagnosed the same as it was on April 11, 1958, as stated in (a) above; and that the examining physician was of the opinion that plaintiff was not qualified for further military service by reason of plaintiff’s said diagnosed disability.
(c) On April 23, 1958, a three-member Medical Board at Letterman Hospital met and issued a report, which contained the same recommended diagnosis of plaintiff’s condition as set forth in (a), above. The report further stated that in nontechnical language plaintiff’s disability was “Severe mental illness” [emphasis supplied]; that the cause of his incapacity was incident to service; that the maximum benefit *422 of military hospitalization bad been attained; that plaintiff was medically unfit for retention in the military service; that the degree of his disability was total and permanent; and that the Board recommended he appear before a PEB.
5.(a) On April 24, 1958, a three-member PEB convened at Letterman Army Hospital and after considering plaintiff’s medical records, issued a report containing detailed recommended findings, including a diagnosis of plaintiff’s condition, and recommendation. The Board found that plaintiff was unfit to perform the duties of his rank and grade by reason of physical disability diagnosed as “Schizophrenic reaction, chronic, n.e.c., in partial remission.” The degree of severity was stated to be “Mild w/definite impairment for social and industrial adaptability.” [Emphasis supplied.] VA Code No. 9004 was listed following the above-quoted entries.[2] The PEB found that plaintiff’s unfitness was 30 percent disabling in accordance with the VA Schedule then in current use, and “May be permanent in accordance with accepted medical principles”; that such unfitness was the proximate result of plaintiff’s performance of active duty, i.e., in effect, that it was service connected; that he became physically unfit to perform his military duties in March 1957; that the inception of his disability occurred in September 1955; and that it was incurred in line of duty. In a separate written “comment” supplementing the above report, the President of the Board stated that it had considered plaintiff’s previous hospitalization and that his “medical record shows that he is definitely unfit for further military service”; and the Board recommended that plaintiff be placed on the Temporary Disability Retired . List (TDRL), with a disability rating of 30 percent, a reevaluation to be made in 18 months.
(b) The Board’s findings and recommendations were approved on May 7, 1958, by order of the Secretary of the Army; and plaintiff was placed on the TDRL, with a rating of 30 percent, effective June 2, 1958. It is important to note at this point that said rating made by the Army remained unchanged until plaintiff was removed from the TDRL and *423 permanently discharged from the Army on July 18, 1963. (See findings 13(a) and (b), and 14(a) and (b), infra.)
6. (a) On October 2, 1958, plaintiff was given a medical examination by the Veterans Administration at Nashville, Tennessee, in connection with a claim made by him for disability compensation. A “Rating Sheet” dated October 30, 1958, showing said examination as the “* * * Last Examination,” and the date of rating as October 28, 1958, signed by a three-member Rating Board, stated, among other things, that plaintiff’s “* * * np condition required more than one year’s hospitalization * * * ”; and reported his condition as “SCHIZOPHRENIC REACTION, CHRONIC, IN COMPLETE remission; competent” [emphasis supplied]. A notation was originally made on the Rating Sheet indicating that VA Diagnostic Code No. “9005”[3] was the applicable one identifying .plaintiff’s condition; however, at some later time not disclosed by the record, a line was drawn through said code number and the number “9204”, ibid., handwritten above it. The Board simultaneously assigned initial disability ratings to plaintiff of 100 percent from June 3, 1958 to September 2, 1958; 50 percent from September 3, 1958 to September 2, 1959; and 10 percent from September 3, 1959. Plaintiff was not present nor represented by anyone at the time this rating action was taken by the VA; however, it should be noted that plaintiff did not introduce any evidence, nor cite a specific Statute, regulation or other legal authority, showing that he had a right to be present or represented; nor is there any evidence that he ever asserted any such right, or made a request along these lines.
(b) Paragraph 29 of the VA Schedule (1957 Ed.), which was in effect at the time the ratings set forth in (a), above, were made, read in part:
* * * A total disability rating will be assigned without regard to the provisions of the rating schedule when *424 it is established that a service-connected organic disease or injury by reason of an exacerbation has developed actual total incapacity which has required hospital treatment for a period in excess of 21 days. * * * This total disability rating should be assigned only when the service-connected condition during the period of 21 days’ hospitalization presents clinical manifestations of sufficient severity to cause total incapacity in the average person. * * *[4]
(c) It would appear that the ratings set forth in (a), above, were “Convalescent” ratings specifically made pursuant to NOTES (1) and (2), which appear (among other places), in the YA Schedule under VA Code No. 9005, partially quoted in finding 16(d), infra, and pursuant, generally, to said Paragraph 29. Although, as noted in findings 8(a) and 9(a), infra, the YA, at the request of the Army, made two “Army Retired Periodic” medical examinations, including special psychiatric examinations, of plaintiff for the purpose of disability evaluations by the Army between the date on which these three ratings were assigned to plaintiff and the date (July 18, 1968) he was removed from TDRL and discharged from the Army, the YA did not make any rating, physical examinations of him during said period of time for the purpose of ascertaining, medically, whether or not the stated changes in the ratings on the effective dates established were warranted. The YA disability rating of 10 percent made on October 28, 1958, to become effective September 3, 1959, continued through July 18, 1963 (the date of plaintiff’s separation), and until March 8, 1965, the effective date of a disability evaluation rating of 30 percent assigned to plaintiff by the YA on August 3, 1965, following an examination made of him by the VA on March 8, 1965, for treatment purposes and another YA examination on August 2, 1965. (See finding 26(a), infra.)
7. (a) On September 14, 1959, plaintiff reported to the U.S. Army Hospital, Fort Campbell, Kentucky, and was *425 given his first TDRL Physical Evaluation examination after being placed on the TDRL effective June 2, 1958. On September 18, 1959, a three-member Medical Board convened at said hospital and submitted a report, which included substantially the same findings, diagnosis, and recommendation contained in a narrative summary of plaintiff’s case, signed by an Army physician who examined plaintiff at the same hospital on September 14, 1959. The Board diagnosed plaintiff’s condition in words that read in part:
* * * Schizophrenic reaction, n.e.c., chronic, severe, in partial remission; manifested on previous evaluation by delusions, hallucinations, withdrawal and agitated behavior ; now manifested by anxiety; and tenuous adjustment to civilian life. * * * Condition: Improved. This corresponds most closely to VA Diagnosis #9004 (b) Dementia praecox, mixed type, in partial remission, with definite impairment of social and industrial adaptability. Motivation for Further Service: Not good.
A physical profile of P-1, U-1, L-1, H-1, E-1, and S-4 was assigned to plaintiff. The Board found plaintiff’s disability then to be of such a degree that he was temporarily, totally unfit for further military service; and it recommended that he be retained on the TDRL with reevaluation in 12 months.
(b) Although the Board did not assign a specific percentage of disability to plaintiff, it is clear from the diagnosis— statement of the Board (quoted in (a), above) and a reading of VA Code No. 9004 (partially quoted in finding 16(d), infra), that the Board’s diagnosis supported a disability rating of 30 percent. Furthermore, in view of the fact that plaintiff was continued on the TDRL in accordance with the Board’s recommendation that this be done (see (c), infra), it is implicit from the diagnosis in question that plaintiff’s disability was considered by the Army as ratable at not less than 30 percent, otherwise he properly could not have been kept on the TDRL. In this connection, it will be noted (by reference to finding 6, supra) that at the time the Army made the above-mentioned physical evaluation, medical examination and determination that plaintiff should be (and was) continued on the TDRL with a disability rating of 30 per *426 cent, his disability was rated by the YA (on October 28, 1958) for disability compensation purposes at 10 percent.
(c) By letter dated September 28,1959, the Army advised plaintiff that since the report of his periodic physical examination, mentioned in (a) and (b), above, revealed that his disability had “not stabilized,” he would continue as a member on the TDRL; and that his next periodic physical examination was scheduled for September 1960.
8. (a) Attached to a report dated September 8, 1960, but not released until December 1,1960, covering a medical examination made of plaintiff at the Veterans Administration Regional Office, Nashville, Tennessee- for “Disability Evaluation” in connection with an “Army Retired Periodic” examination, is a Special Psychiatric Examination report dated November 25,1960, which sets forth the results of an examination made of plaintiff by a YA psychiatrist at the aforesaid regional office. The latter report contains the following diagnosis:
Schizophrenic reaction, chronic, undifferentiated type, with minimum symptomatology, reasonably good socio-educational adjustment and with judicious handling, prognosis for his continued success in academic and, later on, in civilian life is quite good, certainly exceptional for a man who has this basic diagnosis. He has tremendous intellectual resources which, if used, will be of great value to him.
Competent. Disability minimal so far as school is concerned. I don’t think I can comment or predict his reaction to the pressures of life outside of school work.
(b) By letter dated December 80,1960, plaintiff was again advised by the Army that since a review of the report covering his periodic physical examination, mentioned in (a), above, revealed that his disability had “not stabilized,” he would continue as a member on the TDRL; and that his next periodic physical examination was scheduled for September 1961.
9. (a) On September 1, 1961, plaintiff was given another periodic reevaluation medical examination at the Veterans Administration Regional Office, Nashville, Tennessee, which included a special psychiatric examination on said date by the same psychiatrist who examined plaintiff in November *427 1960 (finding 8(a), supra). The latter examining physician diagnosed plaintiff’s condition as follows:
Schizophrenic reaction, chronic, undifferentiated type, characterized by minimal symptomatology, but with definite slight exaggerations of reality and other kinds of autistic and schizophrenic thinking, not of large proportions but more so than at the time of last examination. Degree of Incapacitation: For military service, active: Severe; for continued civilian pursuits; Mild to moderately severe.
He is competent.
(b) By letter dated October 10, 1961, plaintiff was once again advised by the Army that since a review of the report covering his periodic physical examination, mentioned in (a), above, revealed that his disability had “not stabilized,” he would continue as a member on the TDEL; and that his next periodic physical examination was scheduled for January 1963.
10. On January 7, 1968, plaintiff was given a periodic reevaluation physical examination at the U.S. Army. Hospital, Fort Campbell, Kentucky, and one of the examining physicians recommended that plaintiff be placed before a PEB for consideration for permanent retirement. The report covering this examination did not include plaintiff’s entire physical profile; but it is reasonable to assume from a comparison of the diagnosis set forth therein and subsequently concurred in by the Medical Board (as noted infra), with the diagnosis made by the Medical Board which met on September 18, 1959 (finding 7(a)), that if the January 7, 1963 report had included plaintiff’s physical profile, it would or should have been essentially the same as the one assigned to plaintiff in the Medical Board report of September 18, 1959, ibid. On January 22, 1963, a three-member Medical Board convened at the same hospital and in a unanimous decision diagnosed plaintiff’s condition as follows:
* * * Schizophrenic reaction, n.e.c., chronic, severe, manifested during hospitalization by delusions, hallucinations, withdrawal, and agitated behavior, in partial remission; now manifested by paranoid thinking, illusions, and occasional hallucinations.* * *■
*428 This diagnosis was identical with the one made by the physician who examined plaintiff on January 7, 1963, as mentioned above. The Board unanimously concurred in the recommendation of the examining physician that plaintiff be placed before a PEB for consideration for permanent retirement. Plaintiff expressed in writing a desire to be present at the hearing of his case by a PEB and to be represented by military counsel.
11. (a) In accordance with the recommendation of the Medical Board set forth in its report dated January 22, 1963, a PEB convened at Fort Benning, Georgia, on March 25,1963. A report issued the same date covering these proceedings reflects that the latter Board’s recommended diagnosis of plaintiff’s condition was “Schizophrenic reaction, undifferentiated type, in partial remission.” The degree of severity was indicated as “Slight impairment of social and industrial adaptability.” The diagnosis was identical with Veterans Administration Diagnostic Code No. 9204 (partially quoted in finding 16(e)). The Board found plaintiff to be physically unfit to perform his military duties by reason of physical disability considered “permanent” and rated his disability at 10 percent. Plaintiff was not notified of this meeting of the PEB and given an opportunity to be present. By order of the Secretary of the Army, the Adjutant General of the Army, on May 8, 1963, advised the President of the PEB at Fort Benning in pertinent part as follows:
1. The proceedings of the Physical Evaluation Board which convened at Fort Benning, Georgia, on 25 March 1963, in the case of M/SGT Charles W. Snyder * * * are null and void because of irregularities of procedure considered fatal to the principles of a full and fair hearing provided by statute and regulations. Written notice of the time and place of the physical evaluation board meeting was not given to the member.* * *
2. The records in the case, less the disapproved physical evaluation board proceedings will be referred to a new hearing before a board composed entirely of officers who were not members of the original board, and the new board proceedings returned to the Department of the Army, Attention: U.S. Army Physical Review Council, with the least practicable delay.
*429 (b) Plaintiff testified to tlie effect that as a result of the findings and recommendation of the PEB, he became so completely maddened that he was helpless to cope with his paranoia.
12. (a) A new PEB was convened at Fort Benning, Georgia, on June 6, 1968. Plaintiff appeared and was represented by counsel at this hearing. Plaintiff advised the Board that he desired to continue his service in the Army in the same grade held by him at the time he was placed on the TDRL in 1958; and he expressed the belief that he was qualified and able to discharge his military duties if recalled. Plaintiff presented testimony to the effect that subsequent to being placed on the TDR.L he had worked as a laborer in a stone quarry until the fall of 1958; that in 1959 he had entered Peabody Teachers College where he majored in biology, and received a Bachelor of Science degree from that institution on June 1, 1962; that he worked in a rendering plant operated by his brother-in-law during the entire time he was attending college; that after graduation from college, he worked for a “very short time” as a substitute teacher in the Davidson County (Tennessee) School System, teaching primarily high school classes; and that, thereafter, he obtained employment as a substitute mail clerk in the post office at Nashville, Tennessee, on a temporary basis, a position he held at the time of the hearing before the Board. After considering certain of plaintiff’s medical records and his testimony,[5] the Board issued a report, dated June 6, 1963 (Def’s Ex. 1, p. 38), covering the proceedings. Page 1 of the report reflects that the only medical records relating to plaintiff that were introduced in evidence consisted of “Med Board Prcdgs, USAH, Ft Campbell, Ky, dtd 22 Jan 63” and “Current Clinical Records”; and that the Board recommended plaintiff be found “Physically Fit” for active military service. The report does not reflect a diagnosis, VA Diagnostic Code number, percentage disability rating, nor any other significant information. Pages *430 2 and 3 of the report form are completely blank. A summary of the PEB proceedings, dated June 6, 1963, reads in part:
* * * After careful consideration of the evidence of record and the testimony of the member, the Board is of the opinion that member has recovered from the condition for which he was originally placed on the Temporary Disability Eetired List and may now be considered physically fit for service. This finding ¡was reached in view of the fact that since retirement, member has been able to complete a college education and has been employed as a substitute teacher in a public school system. Member was able to complete his education in spite of having to do part-time work to supplement his income during this period. Furthermore, he displayed no evidence of a mental aberration during his appearance before the Board and appeared to be normal in all respects.
(b) On June 6, 1963, plaintiff signed a statement that he did not desire to submit a rebuttal to the recommended findings of the PEB, indicating that he was satisfied with the Board’s finding that he was physically fit for military duty, and he should be removed from the TDEL.
(c) A Lt. Beit M. Tomasu served as the Eecorder during both the March 25, 1963 PEB proceedings which were voided, and the June 6, 1963 PEB proceedings. Plaintiff testified at the trial that because of this fact, the latter proceedings were unfair because the recorder “suggests” to the Board members “a course of action.” There is no evidence that PEB recorders, generally, act as claimed by plaintiff, or that Lt. Tomasu, in particular, suggested a course of action to the PEB, nor is there any showing by plaintiff that it was illegal or improper for Lt. Tomasu to serve as recorder at both of the PEB proceedings. Plaintiff presented unre-butted testimony to the effect that the doctor member of the last-mentioned Board was not a psychiatrist.
13. (a) The proceedings of the PEB convened at Fort Benning, Georgia, on June 6, 1963, were reviewed by the Army Physical Review Council (PEC) which issued a report dated June 18, 1963, recommending that the PEB findings and recommendation be modified to show plaintiff “is physically unfit” to perform his military duties “by reason of physical disability * * * incurred while entitled *431 to receive basic pay as a regular member” of the Army; a diagnosis of “Schizophrenic reaction, chronic, undifferentiated type”; the degree of severity to be “Slight”; the VA Code No. as 9204 (partially quoted in finding 16(e), infra); the disability “Is permanent”; a disability rating of 10 percent; and a recommendation that plaintiff be “separated” from the service “with severance pay.” The report further reads in part:
REMARKS
The member [plaintiff] is deemed physically unfit for the performance of active military duty commensurate with his age and grade. This finding is in accord with current Army medical standards of fitness for retention on active duty. (Paragraph 3-32, AE 40-501.)
The modified recommended findings (including the diagnosis of plaintiff’s condition, the severity thereof, and the percentage of his disability) and recommendation of the PEC were essentially the same as those made by the PEB that met on March 25, 1963 (finding 11), which proceedings were declared null and void. Hid.
(b) Army Regulation 40-501, Paragraph 3-32 (mentioned under “Remarks” quoted in (a), above), Section XYI, entitled “Psychoses, Psychoneuroses, and Personality Disorders,” relating to standards of fitness for, inter alia, retention on active duty, dated December 5, 1960, and in effect not only on June 18, 1963, but also as of July 18, 1963, reads as follows:
3-32. Psychoses
The causes of medical unfitness for further military service are—
Psychosis: Eecurrent psychotic episodes, existing symptoms or residuals thereof, or a recent history of psychotic reaction sufficient to interfere with performance of duty or social adjustment.
(c) Plaintiff was not afforded a hearing by the PEC in connection with its review of the June 6, 1963 PEB proceedings nor was he represented by counsel during such review. In this connection, it should be kept in mind that while plaintiff appeared and was represented by counsel before said PEB, that Board found him to be physically *432 fit to perform bis military duties, a finding which, according to his unrebutted testimony and other evidence (see findings 23, 25, and 28, infra), he did not attempt to rebut because it was consistent with the position taken by him before the Board, pursuant to erroneous information and advice and false encouragement given to him by his counsel that he could be returned to active duty if the PEB then found him to be physically fit therefor; whereas, consistent with the findings recommended by the PEC without it affording plaintiff a “full and fair hearing,” he was finally “separated” by reason of “physical disability.” (See findings 14(b) and (c) (6), infra.)
(d) By letter (date undisclosed by the record), plaintiff was advised of the modified recommended findings and recommendation of the PEC; informed that if the same were finally approved by the Secretary of the Army, he would be removed from the TDEL and separated from the Army with severance pay; and informed that he had the right to submit a written statement in rebuttal to the modifications recommended by the PEC. Plaintiff filed a rebuttal statement and it, together with the proceedings of the PEB, was forwarded to the Army Physical Disability Appeal Board (PDAB) for review.
14. (a) On July 10, 1963, the PDAB met and issued a report, stating that it had considered “all pertinent evidence of record findings and recommendations of the Medical Board [presumably the Medical Board that met on January 22, 1963 — finding 10], the Physical Evaluation Board [presumably the PEB that met on June 6, 1963 — finding 12(a)], and the Army Physical Review Council [proceedings on June 18, 1963 — finding 13(a)], and * * * [plaintiff’s] rebuttal,” (finding 13(d)); and that the Board 'had found as follows:
The findings and recommendations of the Physical Evaluation Board as modified by the Army Physical Review Council are supported by the evidence of record, are correct in fact, and are in accordance with Department of the Army policies pertaining to physical fitness and/or physical disability separation or retirement.
*433 The above report also contains the following:
Recommendation: In view of the above findings, the board recommends that the Adjutant General take appropriate administrative action consistent therewith.
(b) The report and action of the PDAB was approved 'by the Adjutant General on July 18, 1963, by order of the Secretary of the Army. Thereafter, by Special Order 170 issued on the same date, plaintiff’s name was removed from the TDKL under the provisions of 10 U.S.C. § 1203, and he was honorably discharged from the Army with a disability rating of 10 percent and entitlement to severance pay computed under the provisions of 10 U.S.C. § 1212(a) (A).
(c) Judicial notice is taken of the statutes referred to in (b), above, as well as certain other relevant statutes involved in this case; and the pertinent parts of the provisions of some of the same are quoted, infra, for convenient reference in connection with particular detailed and conclusionary findings contained herein.
(1)10 U.S.C. §1201 (1964) provides in part as follows:
Upon a determination by the Secretary concerned that a member of a regular component of the armed forces * * * is unfit to perform the duties of his office, grade, rank, or rating because of physical disability incurred while entitled to basic pay, the Secretary may retire the member with retired pay computed under section 1401 of this title, if the Secretary also determines that—
(1) based upon accepted medical principles, the disability is of a permanent nature;
(2) the disability is not the result of the member’s intentional misconduct or willful neglect, and was not incurred during a period of unauthorized absence; and
(3) either—
(B) the disability is at least 30 percent under the standard schedule of rating disabilities in use by the Veterans’ Administration at the time of the determination ; and either—
(i) the member has at least eight years of service computed under section 1208 of this title;
*434 (2) 10 U.S.C. § 1202 (1964) provides in part as follows:
Upon a determination by the Secretary * * * that a member of a regular component of the armed forces entitled to basic pay * * * would be qualified for retirement under section 1201 of this title but for the fact that his disability is not determined to be of a permanent nature, the Secretary shall, if he also determines that accepted medical principles indicate that the disability may be of a permanent nature, place the member’s name on the temporary disability retired list, with retired pay computed under section 1401 of this title.
(3) 10 U.S.C. §1203 (1964) provides in part as follows:
Upon a determination by the Secretary concerned that a member of a regular component of the armed forces entitled to basic pay * * * is unfit to perform the duties of his office, grade, rank, or rating because of physical disability incurred while entitled to basic pay, the member may be separated from his armed force, with severance pay computed under section 1212 of this title, if the Secretary also determines that—
* * * * *
(3) based upon accepted medical principles, the disability is or may be of a permanent nature; and
(4) either—
(A) the disability is less than 30 percent under the standard schedule of rating disabilities in use by the Veterans’ Administration at the time of the determination, and the disability was (i) the proximate result of performing active duty, or (ii) incurred in line of duty in time of war or national emergency;
* * * # *
(4) 10 U.S.C. § 1210 (1964) provides in part as follows:
(a) A physical examination shall be given at least once every 18 months to each member of the armed forces whose name is on the temporary disability retired list to determine whether there has been a change in the disability for which he was temporarily retired.* * *
(b) The Secretary * * * shall make a final determination of the case of each member whose name is on the temporary disability retired list upon the expiration of five years af ter the date when the member’s name was placed on that list. If, at the time of that determination, the physical disability for which the member’s name was carried on the temporary disability retired list still exists, it shall be considered to be of a permanent nature.
*435 (c) If, as a result of a periodic examination under subsection (a), or upon a final determination under subsection (b), it is determined that tlie member’s physical disability is of a permanent nature and is at least _ 30 percent under the standard schedule of rating disabilities in use by the Veterans’ Administration at the time of the determination, his name shall be removed from the temporary disability retired list and he shall be retired under section 1201 * * * of this title * * *.
$ $ $ $ $
(e) If, as a result of a periodic examination under subsection (a), or upon a final determination under subsection (b), it is determined that the member’s physical disability is less than 30 percent under the standard schedule of rating disabilities in use by the Veterans’ Administration at the time of the determination, and if he has less than 20 years of service * * * his name shall be removed from the temporary disability retired list and he may be separated under section 1203 * * *.
(f) If, as a result of a periodic examination under subsection (a), or upon a final determination under subsection (b), it is determined that the member is physically fit to perform the duties of his office, grade, rank, and rating, the Secretary shall treat him as provided in section 1211 of this title.
$ $ ^ ‡
(h) If his name is not sooner removed, the disability retired fay of a member whose name is on the temporary disability retired list terminates upon the expiration of five years after the date when his name was placed on that list. [Emphasis supplied.]
(5) 10 U.S.C. § 1211 (1964) provides in part as follows:
(a) With his consent, any member of the Army * * * whose name is on the temporary disability retired list, and who is found to be physically fit to perform the duties of his office, grade, or rank under section 1210(f) of this title, shall—
^
(3) if an enlisted member of a regular component, be reenlisted in the regular grade held by him when his name was placed on the temporary disability retired list or in the next higher regular enlisted grade;
(6) 10 U.S.C. § 1214 (1964) provides in part as follows:
No member of the armed forces may be retired or separated for physical disability without a full and fair hearing if he demands it.
*436 (7) 10 U.S.C. § 1216 (1964) provides in part as follows:
(b) The Secretary * * * has all powers, functions, and duties incident to the determination under this chapter of—
(1) the fitness for active duty of any member of an armed force under his jurisdiction;
(2) the percentage of disability of any such member at the time of his separation from active duty; [See finding 16(a), m/m.]
(3) the suitability of any member for reappointment, reenlistment, or reentry upon active duty in an armed force under his jurisdiction; and
(4) the entitlement to, and payment of, disability severance pay to any member of an armed force under his jurisdiction.
(d) A document, entitled “payroll computatioN and financial statement” (Plaintiff’s Ex. 35), and prepared on June 14, 1963, reflects that a change in payment to plaintiff was made by the Army in said month with the result that he did not receive retired pay for any part of June 1963; and that the last retired pay payment made to him was for the month of May 1963. A notation on this document reads: “Retired from Temporary Disability Retired List, 5 year tenure completed.” Since plaintiff’s name was placed on the TDRL as of June 2,1958 (finding 5(b)), his name had been thereon for a period of 5 years on June 1, 1963; and, therefore, it is assumed that plaintiff’s disability retired pay was terminated and his name “retired” from the TDRL payroll for retired pay purposes, effective as of the last-mentioned date, pursuant to 10 U.S.C. § 1210 (h) (quoted in (c) (4), above); and that the Army did not pay plaintiff any disability retired pay from June 1,1963, forward to the date of his discharge on July 18,1963. However, despite the aforestated facts, the evidence conclusively shows that plaintiff’s name was not actually removed from the TDRL until the last-mentioned date. In sum, during the period from June 1, 1963 to July 18, 1963, plaintiff’s name was maintained on the TDRL but he was not paid disability retired pay; he was not carried in an active duty status nor paid basic pay; and he was simply a member of the Army released to inactive duty without pay.
*437 15. It is important to invite attention to the fact that the findings, recommendations and actions outlined in findings 12(a), 13 (a) and (d), and 14 (a) and (b), occurred without any medical or physical examination, or personal observation (except the PEB proceedings held on June 6, 1963 — finding 12(a)) being made of plaintiff for the purpose of determining his actual condition at the times of such occurrences; that the last physical-medical examination made of plaintiff by the Army prior to the times such findings and recommendations were made and actions taken, was made in connection with the Medical Board proceedings held on January 22, 1963 (finding 10); that the last physical examination of plaintiff by the VA was made on September 1, 1961 (finding 9 (a) and (b)), which was a periodic physical examination made as a matter of accommodation and assistance to the Army in reevaluating plaintiff’s condition and fitness for military service rather than for disability compensation rating purposes; and that the last physical examination made of plaintiff by the VA for the purpose of rating his disability for disability compensation prior to the time he was discharged from the Army on July 18,1963, occurred in October 1958. (See finding 6 (a) and (c).)
II
16. (a) Under 10 U.S.C. § 1201 (1958), and (as shown in finding 14 (c) (1)) 10 U.S.C. § 1201 (1964), the percentage of physical disability of a member of a regular component of the armed forces who has become physically unfit for duty by reason of physical disability is to be determined “under the standard schedule of rating disabilities in use by the Veterans’ Administration at the time of the determination * * *
(b) The VA Schedule for Bating Disabilities (1957 Ed. which was a reprint of the 1945 edition, as modified by the extant extensions, through January 16, 1957) provided in part as follows:
GENERAL POLICY IN RATING
* * ¡I: * *
3. Resolution of Seasonable Doubt. — It is the defined and consistently applied policy of the Veterans Admin *438 istration to administer the law under a broad interpretation, consistent, however, with the facts shown in every case. When after careful consideration of all pro-cureable and assembled data, a reasonable doubt arises regarding * * * the degree of disability * * * such doubt will be resolved in favor of the claimant.
By reasonable doubt is meant one which exists by reason of the fact that the evidence does not satisfactorily prove or disprove the claims, yet a substantial doubt and one within the range of probability as distinguished from pure speculation or remote possibility. It is not a means of reconciling actual conflict or a contradiction in the evidence; the claimant is required to submit evidence sufficient to justify a belief in a fair and impartial mind, that his claim is well grounded. Mere suspicion or doubt as to the truth of any statements submitted, 'as distinguished from impeachment or contradiction by evidence or known facts, is not a justifiable basis for denying the application of the reasonable doubt doctrine if the entire, complete, record otherwise warrants invoking this doctrine. The reasonable doubt doctrine is also applicable even in the absence of official records, particularly if the basic incident allegedly arose under combat, or similarly strenuous conditions and is consistent with the probable results of such known hardships.
7. Higher of Two Ratings. — If there is a reasonable doubt, as above defined, as to which of two ratings shall be applied in any given case, the claimant is entitled to the higher.
(c) Effective December 1, 1963, the YA Schedule was amended by, inter alia, deletion of the definition of “reasonable doubt” set forth in paragraph 3 partially quoted in (b), above, and by revising paragraph 7, ibid., to read as follows:
Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned.
(d) As of the dates of the physical examinations, reports, diagnoses, ratings, and actions referred to in findings 4 to 9, *439 inclusive, supra, the VA Schedule provided in pertinent part:[6]
PSYCHIATRIC CONDITIONS
:Ji jJí Hí # %
THE PSYCHOSES

Bating

$ $ $ $ *
9004 Dementia praecox, mixed type.
In partial remission,'following total * * * with lesser symptomatology such as to produce:
# íJí ij: ‡ ❖
(b) Definite impairment of social and industrial adaptability- 30[7]
*****
In complete remission
Hollowing a psychotic period which required hospitalization for 1 year or more, following the convalescent rating
For the first year_ 50
Thereafter_ 10
*****[8]
[Emphasis supplied.]
9005 [9] Manic depressive psychosis
* * m * *
In complete remission
Following a psychotic period which required hospitalization for 1 year *440 or more, following the convalescent rating
For the first year-50
Thereafter_ 10
NOTE (1) Convalescent ratings in psychoses. Upon discharge or trial visit from a hospital where a beneficiary has been under care and treatment for a period of not less than 6 months, a rating of 100 percent willbe 'continued for a period of 3 months, after which the condition will be rated in accordance with the' degree of disablement shown and in conformity with the schedule provided.
(2) In determining the degree of disability from the psychoses the rating agency should consider, in addition to the symptomatology, the record as to frequency, duration and severity of previous psychotic episodes over a term of years, so as to represent the average level of social and industrial inadaptability.[10]
(e) As previously indicated, the provisions of the VA Schedule referred to and partially quoted in (d), above, remained unchanged and in effect until the Schedule was amended and revised, effective October 1,1961, at which time the 9000 series of VA Code numbers was discontinued and replaced by the 9200 series (Code Nos. 9200-9210). As revised, the VA Schedule then provided in pertinent part:
MENTAL DISORDERS
*****
PSYCHOTIC DISORDERS

Rating

*****
9203 Schizophrenic reaction, paranoid type

9203 Schizophrenic reaction, chronic undifferentiated type

9206 Manic depressive reaction _
_ 9207 Psychotic depressive reaction
9208 Paranoid reaction (specify)
:l: *. * *
*441 General Eating Formula for Psychotic Eeactions:
Active psychotic manifestations of such extent, severity, depth, persistence or bizarreness as to produce complete social and industrial inadaptability_100
With lesser symptomatology such as to produce severe impairment of social and industrial adaptability _ 70
Considerable impairment of social and industrial adaptability_ o i£5
Definite impairment of social and industrial adaptability_ o CO
Slight impairment of social and industrial adaptability_ © t-H
Psychosis in full remission_ o
Convalescent ratings in psychotic reactions: Upon discharge or departure on -trial visit (completion of bed occupancy care) from a hospital where a beneficiary has been under care and treatment for a continuous period in the hospital of not less than 6 months, an open rating of 100 percent will be continued for 6 months. A VA examination is mandatory at the expiration of the 6 months’ period, after which the condition will be rated in accordance with the degree of disability shown. Where the beneficiary has been under hospital care and treatment for less than 6 months and is not ratable at 100 percent under the rating schedule, consideration should be given to paragraph 29, page 13-3R.[11]
[Emphasis added.]
(f) The provisions of the VA Schedule set forth in (e), above, continued in effect through July 18, 1963, the date plaintiff was removed from the TDEL and permanently discharged from the Army (see (c), above), and thereafter at all times material herein. Therefore, said provisions were *442 in effect as of the dates of the physical examinations, reports, diagnoses, ratings, and actions referred to in findings 10 to 14, supra.
III
17. By letter dated August 12, 1963, the Chief of the Armed Forces Claims, National Rehabilitation Service, Washington, D.C., forwarded to the Army Board for Correction of Military Records (ABCMB or Correction Board), a completed application dated August 5, 1963, and signed by plaintiff in which he requested the Board to change his records to show that he was permanently retired from the Army in accordance with the recommended findings and recommendation concerning his disabilities contained in the report covering Medical Board proceedings held on April 23, 1958, in which the Board found, among other things, that plaintiff’s disability condition was “severe,” total and permanent. (See finding 4(c).)
18. (a) On November 22, 1963, the Correction Board transmitted plaintiff’s application of August 5, 1963, together with his Service, Army medical, and VA medical records, as well as a “VA Comp Stmt” (Compensation Statement), to the office of the Surgeon General (SGO), Physical Standards Division, and requested an opinion for the guidance of the Board regarding the medical issues raised by plaintiff. The Board also requested that an opinion be expressed regarding the advisability of having plaintiff appear before a Medical Board or PEB for determination of the issues involved, and any other comments that might be appropriate and helpful in adjudicating plaintiff’s case.
(b) The Correction Board’s letter of November 22, 1963, does not identify the service and medical records, or the Compensation Statement, listed therein as enclosures that were actually sent to the SGO, nor does the evidence clearly disclose such information; however, it may be reasonably concluded from the documentary evidence that the VA records included, or certainly should have included, the VA Bating Sheet dated October 30, 1958, concerning the disability rating of plaintiff’s condition made on October 28, 1958, by the VA for disability compensation purposes (mentioned in finding 6(a)); and that the Compensation Statement *443 listed referred to an undated document in evidence, signed by D. W. Williams, Adjudication Officer, VA Regional Office, Nashville, Tennessee, (Deft’s Es. 1, p. 78) which reads:
STATEMENT OF COMPENSATION
* :U :S * *
The above named veteran was rated 100 per cent from June 3, 1958 to September 2, 1958; 50 per cent from September 3, 1958 to September 2, 1959; and 10 per cent from September 3, 1959 for a service-connected condition of schizophrenic reaction, chronic, in complete remission, incurred during Korean Service. The diagnostic code is 9204. He also has a zero per cent rating under diagnostic code 6297 for a service-connected condition of deafness, partial, with osteoma of the deep roof of the right ear canal which was incurred during peacetime service. Also, he has zero per cent for a peacetime service-connected condition of residuals of fracture, chip, talus, right, under diagnostic code 5273.
He was never paid compensation because he was in receipt of retirement pay and did not elect to receive compensation in lieu of his retirement pay.
(c) As hereinbefore indicated, it appears from the evidence that as of the date the Statement quoted in (b), above, was sent to the SGO, the only disability rating that had been made of plaintiff by the VA was the one of October 28,1958 (mentioned in (b), above). It appears reasonably probable from this fact and a reading of the Statement in question, that the Rating Sheet dated October 30, 1958, ibid., was used in preparing said Statement. It will be noted that the Statement reads in part: “The diagnostic code is 9204.” That said code number was not in use on the date of the above-mentioned Rating Sheet and must have been placed thereon on or sometime after October 1, 1961, is shown in finding 6(a) and n. 3, supra. It also will be noted that the Statement does not reflect the dates on which the disability ratings for the periods referred to therein were made. Therefore, it is apparent that a person reading the Statement, without any knowledge of the Rating Sheet, or the information contained therein, would not be placed on notice that the disability ratings assigned to plaintiff by the VA for stated periods covering dates subsequent to October 28,1958, were made on said date and simply constituted a prognosis of the percent *444 ages of plaintiff’s disability condition in the future, which were never confirmed by physical-medical examination made of plaintiff by the VA for the purpose of, and in connection with, the rating of plaintiff’s disability for disability compensation. On the contrary, the wording of the Statement considered alone gives the incorrect and misleading impression that plaintiff’s disability condition was actually rated on separate occasions for different periods of time on or before the commencement of each period. In view of the foregoing, it is apparent that either the Rating Sheet in question was before the Correction Board and the SGO at the time plaintiff’s application for correction of his military records was considered, in which case the Board and SGO took actions in plaintiff’s case well knowing that the last VA physical examination and rating of plaintiff’s case were made in October 1958; or, the Rating Sheet was not before the Board and SGO at such time, in which case plaintiff’s application was acted upon on the basis of incomplete information and a document (Statement) containing implications of fact that were incorrect and misleading.
19. ( a) In accordance with the Correction Board’s request, Lt. Col. Harold H. Snyder, Physical Standards Division, SGO, acting for the Surgeon General, sent to the Correction Board an advisory opinion dated November 27, 1963, the body of which reads as follows:
1. Records in the case of the * * * [plaintiff] have been carefully reviewed in this office and in the offices of the appropriate consultants to The Surgeon General.
2. Review of the records reveals that this applicant suffered a schizophrenic reaction during his service which required several hospitalizations and led to his placement on TDRL. Four period evaluations showed he was in partial remission and showed improvement in his social and industrial adaptability to where the level of impairment was slight. It is noted that he attended college, received a BA Degree and was employed part-time as a substitute teacher.
3. The opinion is expressed that the applicant’s claim of error or injustice in the previously determined percentage of disability is not substantiated by the medical evidence of record and that the current percentage rating represents a proper permanent evaluation of the disabilities in this case.
*445 (b) The advisory opinion quoted in (a), above, shows that it was based, in partj on the information contained in the summary of the PEB proceedings held on June 6,1963 (finding 12(a)), relating to the fact that subsequent to the time plaintiff had been placed on the TDB.L, he had been able to complete a college education while performing part-time work, and had been employed as a substitute teacher in a public school system. The foregoing should be considered in light of the testimony presented to the PEB by plaintiff concerning Ms education and work activities, which is summarized in finding 12(a). Plaintiff, in objecting to the aforementioned statements in question contained in said advisory opinion, asserts, in substance, that he was able to work as a part-time teacher, and only in that capacity, because a full-time teacher was required to pass a physical and mental examination, which he was unable to do; whereas a part-time teacher did not have to pass such an examination; however, there is no testimony or other evidence in the record to corroborate and support such assertions.
20. After receiving the November 27, 1963 advisory opinion of the SGO, the Correction Board, without affording plaintiff a hearing, determined on March 18, 1964, that he was not entitled to the relief requested by him in his application of August 5, 1963; and advised both plaintiff and his counsel of this denial by letter dated March 30, 1964.
21. Thereafter, plaintiff submitted additional information to the Correction Board for consideration; and after reconsideration of plaintiff’s application, the Board reaffirmed its previous denial of relief in a letter to plaintiff dated October 1, 1964.
22. By letter dated April 23, 1965, plaintiff again requested the Correction Board to reconsider his application for relief, wHch request was denied by the Board on April 30, 1965.
23. Plaintiff made another request of the Correction Board that his records be corrected on the grounds of “error and injustice” concerning his case in a letter dated July 3, 1965, which reads in part:
The error can be found in the physical evaluation board proceedings held in June 1963, which found me fit *446 for recall to active military service [see finding 12(a)]. The board, which convened at Fort Benning, Georgia [ibid.], found me physically and mentally qualified for reentry into the Army when in fact, I could neither be reenlisted or recalled under enlistment regulations appropriate to my case at that time. I could not be recalled or reenlisted, under any circumstances at that time, because I had a history of severe mental disorder. This fact made the findings of the board invalid under the law and army regulations.
The military counsel assigned to my case, Allan L. Matthews 078094 Captain Inf., informed me that I could be recalled or reenlisted in the grade and rank held at the time of my placement on TDKL, and so advised me to request recall to active duty. This was false and erroneous information and advice from counsel because it is a fact that no former member of the service may be recalled if a diagnosis of a psychotic condition had been previously made.[12]
The degree of disability was arbitrarily assigned by ease of administrative action, which failed to recognize the difference between slight and definite impairment as to my condition. My disability is permanent because of the history of severe mental illness and accordingly I should have been found disabled under regulations for permanent retirement. I am a person of established mental psychosis as evidenced by any and all governmental medical records available for review of records.
24. (a) The Correction Board denied plaintiff’s request for relief of July 3,1965, and so advised plaintiff in a letter dated July 12, 1965, which reads in part:
As you were previously advised, your case was comprehensively reviewed by the Board on 18 March 1964, and it was determined that insufficient evidence of error or injustice was disclosed to warrant a formal hearing in your case.
Prior to your removal from the Temporary Disability Retired List and honorable discharge by reason of physical unfitness to a degree of 10 per cent, your case was the subject of several re-evaluations. It is further noted that the Veterans Administration has also rated your condition as in complete remission and 10 per cent disabling. [Emphasis supplied.]
*447 (b) The italicized sentence in the letter partially quoted in (a), above, is considered highly important, since this language strongly suggests that the Correction Board attached a great deal of weight to the stated rating determination of the VA; that not only at the time plaintiff’s August 5, 1963 application to the Board for relief was initially denied but also on the dates his several requests for reconsideration were rejected, the Board had before it the YA Statement of Compensation (mentioned in finding 18(a), quoted in finding 18 (b), and the subject of comment in finding 18 (c)), but not the Rating Sheet dated October 30, 1958 (mentioned in finding 6(a)). Said letter of July 12, 1965, indicates that at the time it was sent, the Correction Board was, and all along had been, either unaware of the existence of said Rating Sheet, or unaware of, or had failed to consider and appropriately weigh, the fact that the VA ratings mentioned in said Statement were actually made on October 28, 1958, and had not been confirmed by medical examinations made of plaintiff thereafter by the VA for disability compensation rating purposes; and that the VA them, considered plaintiff’s condition as being “in complete remission and 10 percent disabling.” While there is no question but that as a result of the VA physical examination and rating made in October 1958, the VA’s records continued to show plaintiff’s condition as “in complete remission” and only 10 per cent disabling until on or about August 3, 1965, such records did not reflect the YA’s view of plaintiff’s actual condition as of the date he was discharged from the Army on July 18, 1963, nor at the time the Correction Board’s July 12, 1965 letter was sent to plaintiff. (See finding 26, infra.)
25. In addition to writing to the Correction Board on July 3, 1965, plaintiff also wrote to the SGO on the same date as evidenced by a letter sent to plaintiff by the SGO under date of July 14, 1965, which reads in part:
This is in reply to your letter of 3 July 1965 concerning your removal from the TDRL by the Army Physical Review Council in 1963, with a finding of medical unfitness ratable at 10% in accordance with the Veterans Administration Schedule for Rating Disabilities.
Neither the physical evaluation board nor the Army Physical Review Council is under the jurisdiction of *448 Tbe Surgeon General. A separate evaluation of your case by this office at tbe request of tbe Army Board for Correction of Military Records, however, concluded that tbe findings of tbe APEC were correct.
By law, the Army makes its determinations independently of tbe Veterans Administration, using Title 10, rather than Title 38, United States Code. Tbe fact that tbe Army, again by law, uses the same rating schedule as that agency to determine tbe degree of disability ¡often leads to a confusion of the Army’s physical disability retirement system with the Veterans Administration’s veterans’ benefits system. They are quite different in operation.
For example, the Army, unlike the Veterans Administration? does not change the percentage of disability rating, either up or down, in accordance with a former member’s medical condition subsequent to sendee. Its determination is made as of the time of retirement or separation. While you were on TDRL, therefore, your Army rating remained constant at 30%.* * * The VA, meanwhile, changed your ratings in accordance with your condition. Again, the Army rating of 10% at the time of removal from the TDRL (and I understand the VA then also rated you at 10%) is fixed as of that time and will not fluctuate thereafter. The VA will continue to change its ratings to correlate with your disability, if any.
Medical fitness standards for enlistment in the Army are currently contained in Chapter 2, AR 40-501. An authenticated history of a psychotic illness such as schizophrenic reaction is disqualifying for enlistment. [Emphasis supplied.]
26. (a) The VA Regional Office at Nashville, Tennessee, sent to plaintiff a letter dated August 3, 1965, the body of which reads as follows:
Your claim for compensation has been reconsidered in this office based upon all the evidence of record, including your notice of disagreement and a report covering your examination on August 2, 1965 at the Veterans Administration Hospital, Nashville, Tennessee.
After careful consideration, it has been determined that your nervous condition is now shown to be 30 percent disabling and a 30 percent evaluation has been assigned from March 8, 1965, the date of your examination for treatment purposes.
Since all benefits claimed by you have been allowed, your appeal is being withdrawn. * * *
*449 Since the records show that yon are in receipt of retirement pay, compensation cannot be awarded at this time since yon cannot receive retirement benefits and compensation concurrently. Based upon this 30 percent evaluation, you would be entitled to $58 monthly from March 8, 1965. However, in order to receive compensation, you must elect to receive compensation in lieu of retirement pay.
If you elect compensation or waive a portion of your retirement pay, your compensation will be reduced by the amount of retirement pay you have already received. Before you decide, please read the instructions and information on the back of the enclosed VA Form 21-826. We are also enclosing- Forms 8-651 for your convenience in the event you desire to waive all or a portion of your retirement pay.
(b) Plaintiff testified that he never elected to receive “compensation” from the VA, and continued to accept “retirement pay” from the Army.
27. (a) The report covering plaintiff’s examination on August 2, 1965, at the Veterans Hospital in Nashville, Tennessee, bears the same date, and is entitled “special psychiatric examination.” The report was signed by the examining physician, Dr. Harry Witztum, and reads in part:
complaints :
This 37 year old white male, who has spent 11½ years in the army with the rank of Master Sgt. was discharged from the service * * * because of the diagnosis Schizophrenic reaction, paranoid type. He received about 2 years of treatment, at one time for 7 months and the other time for 10 months or so first having received Insulin therapy combined with electro-convulsive treatment and then the benefit of Chemo-Psychotherapy. He is being given Thorazine 150 mgs. spansules b.i.d. according to the Out-Patient record * * * He did some substitute teaching for a while but decided not to enter the teaching profession because of low payments and applied for many different jobs which he allegedly passed 'but was unable to obtain employment because of his past psychiatric history. In October 1962 he obtained employment with the post office and he is a substitute clerk in the mail distribution making $7800 yearly. He also attends law school at night at the YMCA and at this time he finished the first year and embarking on the second, which constitutes considerable hardship and strain on the veteran. He is very concerned about the *450 financial status and future of his family having to support a wife and 6 children ranging in age from 11 years to 9 months. Veteran had different examinations in the past, also recently, during which an evaluation of his mental status was carried out for therapeutic and rating purposes. He is very agitated about the fact that he has been given only 10% disability rating * * * He states that he has been definitely handicapped not only by his past sickness but by the fact that he received a psychiatric medical discharge which astigmatized him in his efforts to better his earning capacity. Veteran is very agitated in the process of responding to different questions, digressing frequently and practically every time when discussing his relationship with the VA and other authorities and having anything to do with his present condition, blaming the Veterans Administration and similar institutions for his hardships. * *
$ $ * $ *
MENTAL STATUS:
Veteran is * * * well developed who appears about his stated age. He is neat, pleasant, cooperative and correctly oriented in all spheres. His flow of conversation is very rapid and in the course of answering different questions he is being carried away by his emotions and becomes very circumstantial and digresses from the subject of the discussion. He appears slightly above average in intelligence and his fund of general information is in keeping with his educational background and environment. His affect at times appears inappropriate as he grins and occasionally laughs in answering questions without justification to exhibit such an affect. It could not be definitely stated whether or not he has hallucinations, as veteran is motivated to prove his qualifications for a higher rating and he volunteers to state that “While driving a car I can see with peripheral vision a person which is exactly not there.” He also reports elaborately about delusions and appears to be confused by the meaning of this word. "When discussing his “delusions” and to which he seems to be quite familiar, having received psychotherapy in the past and apparently reading up on the subject, he becomes involved in a lengthy dissertation of the possibility of having delusions while talking with someone who he thinks might be investigating him and at the same time wondering whether it actually is not a delusion. In general he is very agitated and hostile toward the persons that are operating the Veterans Hospital and feels that he has been -dealt with in an unjust way. He feels that he has been handicapped *451 by bis experience while in the service and he is entitled to a better treatment. Though he manages to function industrially and socially fairly satisfactorily at this time and even studying simultaneously for a degree in law, veteran is unquestionably paranoid on the subject of his relationship with the Veterans Administration and for the psychiatric profession from the standpoint of the unfair treatment he had been exposed to. It is this examiner’s opinion that veteran is presently greatly preoccupied with paranoid ideation referred to mostly with the Veterans organization and this may constitute a serious threat to his functioning and adjustment in the future.
diagnosis: Schizophrenic reaction, chronic, paranoid type.
(b) The evidence shows that plaintiff received thorazine therapy while he was in Letterman Hospital in 1957-1958. Plaintiff presented credible and unrebutted testimony that after 'being discharged from said hospital, he continued to receive out-patient thorazine treatment; and that as of the time of the trial he was taking a 200-milligram capsule of thorazine prescribed for him, the largest dosage ever given to him while in a Government hospital being 150 milligrams.
28. In a letter dated October 20, 1965, plaintiff made another request of the Correction Board for correction of his military records to show he was retired from the Army by reason of physical disability, and also requested reconsideration of the Board’s previous refusal “to admit case to formal proceedings” (apparently indicating he desired the Board to hold a hearing which he would be afforded an opportunity to attend). The letter reads in pertinent part:
* * * The restatement of facts that are included in this letter should warrant some consideration for a situation that has become progressively more difficult to contemplate. I’m aware from information received from government authorities that this whole situation wouldn’t have arisen if I had maintained my insanity throughout the PEB proceedings.. [Plaintiff apparently was referring to the PEB proceedings on June 6,1963 — see finding 12(a) and (b).]
The rating of disability at the time of my discharge, and all previous ratings were matters of opinion to which qualified medical personnel still do not agree. The ratings were arbitrarily assigned by administrative *452 function of the Army on the basis of information then available. The 30% rating at the time of placement on TDRL in June 1958, and the 10% rating in July 1963 were never conclusively determined by an adequate panel of specialists.
The doctors have, at all times, admitted to my permanent disability and informed me that I would be permanently retired at the time of the Medical Board Proceedings in January 1963.
The veterans administration funds me to he 30% disabled at the present time, which is what the Army originally placed me on the TDRL at. The question ox percentage of disability at time of my removal from TDRL was not contested by me because I was assured by my Army counsel that I would be recalled for active duty. I questioned counsel as to my chances for permanent retirement or recall to active duty. He asked me “What do you want?”. I replied “recall” and he informed me that was the best decision. Army counsel should have informed me that under Army regulations I was not then, nor would I ever be, eligible for recall because of my extensive hospitalization for a psychotic condition.
The arbitary assignment of a lower percentage in my disability rating wasn’t contested on the basis that I thought I would be better off by not mentioning my own opinions in the case. I was subsequently removed from the retired list because of a Army’s counsel misstatement of fact. I would like to conclude this letter by stating directly that my condition at the present time is no better than the first time I was placed before a PEB at Letterman Army Hospital in May of 1958. This is a matter of undisputed fact. [Emphasis supplied.]
29. (a) In reply to plaintiff’s letter of October 20, 1965, the Executive Secretary of the Correction Board sent a letter to plaintiff which reads in pertinent part:
A careful review of the information contained in your letter, in conjunction with that of record, fails to reveal anjr basis for reopening your case. Therefore no further action is contemplated on your application by this Board.
(b) It will be noted by reference to finding 26(a) that at the time the letter partially quoted in (a), above, was sent, plaintiff’s condition was then rated by the YA as 30 percent disabling for compensation purposes. It is quite apparent that prior to the time said letter was sent to plaintiff, the *453 Correction. Board either did not inquire of the VA as to whether it had made any physical examinations of plaintiff and change in his disability rating subsequent to July 12, 1965, the date the Correction Board denied plaintiff’s July 3, 1965 request for correction of his records, or the Board did make such an inquiry and learned of the aforestated medical and rating actions taken by the VA 'but gave no weight to such information.
30. By application dated July 31, 1967, plaintiff again requested the Correction Board to correct his records to show disability retirement, stating in part:
The disability which was service connected was considerable and definite as arbitrarily decided to be slight by US Army Appeals Board. I was incapable of judgment at the PEB board proceedings in 1963 and was falsely advised by government counsel to attempt to reenter the Army against the advice of army doctors.* * *
Plaintiff also indicated that he desired to appear before the Board.
31. (a) Thereafter, the Correction Board acknowledged receipt of plaintiff’s July 31, 1967 application in a letter sent him by the Executive Secretary of the Board under date of September 25, 1967, which reads in part:
In your original application, which was considered by the Board on 18 March 1964, you requested permanent retirement by reason of physical disability at the time of your removal from the Temporary Disability Retired List on 18 July 1963.
The Board’s review of your case indicates that you were placed on the Temporary Disability Retired List on 2 June 1958 and you were periodically evaluated during the next five years. Following your final physical evaluation you were determi/ned to be physically unfit and assigned a disability rating of 10 percent which resulted in your discharge by reason of physical disability on 18 July 1963.
Prior to the Board’s determination that a formal hearing was not warranted in your case, your Army and Veterans Administration medical records were comprehensively reviewed by the Department’s medical authorities. The opinion was expressed that the percentage of disability assigned your condition at the time of your *454 discharge was correct. Accordingly, your original application was denied.
A careful review of the information contained in your latest application fails to reveal any basis to warrant a change in the prior decision of the Board. Therefore, in the absence of evidence of error or injustice, not previously considered, no further action is contemplated in your case. [Emphasis supplied.]
(b) The italicized portion of the letter partially quoted in (a), above, apparently refers to the findings and recommendation contained in the report of the PDAB dated July 10, 1963 (finding 14(a)), which was approved on July 18, 1963, by order of the Secretary of the Army (finding 14(b)). It will be noted that the “final evaluation” and assignment of “a disability rating of 10 per cent” by the Army represented approval of the recommended findings and recommendation contained in the report of the PNC dated July 6, 1963 (finding 13(a)) ; that the same were identical with those made by the PEB on March 25, 1963, which proceedings were declared null and void (finding 11); and that the last physical examination made of plaintiff by either the Army or the YA prior to the action taken by the PDAB on July 10, 1963, occurred on January 7, 1963 (finding 10), in connection with proceedings of the Medical Board on January 22, 1963 (ibid.), which Board found plaintiff’s nervous condition to be “severe,” and recommended that he be placed before a PEB for consideration for permanent retirement (ibid.).
32. (a) After plaintiff was placed on the TDBL, and before he was discharged from the Army, he made several unsuccessful efforts to obtain permanent, full-time Federal employment.
(b) In August or September 1958, he took an examination for the position of Immigration Patrol Inspector. An undated Notice of Bating reflects that the United States Civil Service Commission (CSC) advised plaintiff that he was ineligible for said position because of “Failure to meet physical requirements (history of a nervous condition).”
(c) Some time in 1958, plaintiff applied to the U.S. Post Office, Nashville, Tennessee, for the position of Career Substitute Distribution Clerk. By letter dated December 24, 1958, *455 plaintiff was advised by the Postmaster in said city that the “Regional Medical Officer” had ruled that he (plaintiff) was ineligible for the aforestated position. Plaintiff apparently appealed from this ruling, as evidenced by a letter sent to him under date of April 6, 1959, by the CSC, which reads in part:
* * * As a result of careful review of the record in your case (including the material you furnished) it is necessary to sustain the action of our Fifth Civil Service Region in finding your application in the substitute clerk-carrier examination ineligible for medical reasons. This decision is based on the nature, extent, and recency of your nervous disorder as shown on the reports.
When you can furnish proof of a satisfactory period of employment (from six months to twelve months) to serve as evidence that you have undergone a period of •adjustment further consideration will be given your case.
Plaintiff testified that after he was rejected for employment by the Post Office Department, he became so outraged that “a permanent state of paranoia resulted.”
(d) On July 17, 1962, the CSC, Atlanta Region, Atlanta, Georgia, sent to plaintiff a Notice of Examination Results relating to a Federal Service Entrance Examination (FSEE) taken by him on January 13, 1962. The notice reflects that plaintiff was rated “Eligible” for both a GS-5 and GS-7 position, his numerical rating being 90.3, including 10 points credit allowed for Veteran Preference. On November 13, 1962, the same above-mentioned CSC office sent plaintiff another notice of examination results relating to another FSEE taken by him on October 13,1962. This notice also indicated that plaintiff was eligible for a GS-5 or GS-7 position, his numerical rating being 90.7, including 10 points credit allowed for Veteran Preference.
(e) After graduating from Peabody Teachers College in June 1962, plaintiff applied, and was rejected, for employment at Robins AFB, Georgia, as evidenced by a letter sent to him, dated June 14, 1962, by the Chief, Civilian Personnel Division, at said base, which letter reads in part:
1. Reference is made to your selection for the position of Management Assistant, GS-5.
2. Your Certificate of Medical Examination has been reviewed by our Industrial Medical Officer, and he has *456 determined that you do not meet the physical requirements for the position. Your application and the medical certificate are being returned to the Atlanta Region, U.S. Civil Service Commission, for post audit and review. You will receive further information concerning your disqualification from the Atlanta Office.
Plaintiff apparently appealed from the above-mentioned unfavorable action, as witnessed by a letter sent to him by the Regional Office of the CSC, Atlanta, Georgia, on September 5, 1962, which letter reads in part:
This is in further reference to your letter of July 6, 1962 to the President, which after referral to the Commission by the White Plouse, was transmitted to this office for reply.
We have now received information from Robins Air Force Base which enables us to make a final reply concerning your physical ineligibility for the position of Management Assistant, GS-5.
We have been advised that this particular position under the Federal Service Entrance Examination requires travel by military and commercial carrier overseas, and the overseas physical standards preclude employment of applicants with a history of any nervous condition. These off Base duties (Zone of Interior and Overseas) constitute a major requirement of this particular position.
For your information however, your application has been returned to our Examining Division, as physically eligible, in order that you may receive continued consideration for other positions under the Federal Service Entrance Examination.
(f) As previously indicated (finding 12 (a), supra), plaintiff finally obtained a position with the Post Office Department sometime (date undisclosed by the record) prior to his discharge from the Army in July 1963. At the time of the trial of this case plaintiff was employed as a mail clerk by the Post Office in Nashville, Tennessee. Although it is not entirely clear, it appears that plaintiff’s job status was then the same as it was during the June 6, 1963 PEB proceedings, i.e., he was. still employed as a substitute mail carrier on a temporary basis. In response to a question which plaintiff asked of himself (see finding 36, infra) as to how he accounted for the fact that the Post Office had employed him *457 after refusing to do. so for 4 years, plaintiff testified, “My mother in law’s best girlfriend was at the Post Master’s wedding.” Plaintiff then asked himself as to whether he was seriously contending this affected his employment by the Post Office, and replied, “I was unemployed before she called and after contact was made, I was hired.”
33. (a) Plaintiff testified at the trial that subsequent to his discharge from the Army in July 1963, he made other efforts to obtain permanent, full-time, Federal employment.
(b) The evidence shows that on January 30,1965, plaintiff did express in writing an interest in being appointed to the position of Treasury Enforcement Agent. By letter dated March 16, 1965, the Chief of the U.S. Secret Service, Treasury Department, furnished plaintiff a list of qualification requirements, and the physical requirements for such position, and invited his attention to the following statment appearing in the physical requirements: “Nervous System— Applicants must be free from emotional instability and serious nervous condition or mental disease.”
34. Plaintiff filed his original petition in this Court on November 27, 1968, and an amended petition on November 20, 1969. Plaintiff has proceeded herein pro se, with the understandable result that his petition, pretrial and post trial documentary submissions, and presentation of evidence at the trial have left considerable to be desired.
IV
35. At the opening of the trial in Nashville, Tennessee, on November 17, 1970, the parties stipulated, with the approval of the commissioner, that it would be limited to the issue of liability, with the amount of recovery, if any, to be determined in further proceedings pursuant to Rule 131(c).
36. No reports of physical examinations made of plaintiff by private physicians-psychiatrists were introduced in evidence; and the record indicates that he was never examined with respect to his nervous condition by any such person. No physicians, psychiatrists, or other medical witnesses testified at the trial. Testimony was presented only by plaintiff and his wife. Plaintiff propounded the questions asked of his wife at the time of her direct examination. Plaintiff took *458 tlie witness stand and, without objection 'by defendant, was permitted by the commissioner to read a lengthy, prepared statement of questions and answers, with the understanding that after reading a question directed to himself, plaintiff would pause before reading the answer thereto for a sufficient period of time to enable defendant’s attorney to interpose objection to the particular question. Plaintiff’s testimony was largely repetitive, corroborative, and explanatory of statements made by him in documents either quoted in relevant part or summarized or referred to in the findings of fact hereinbefore set forth. Much of the testimony presented by both plaintiff and his wife was incompetent in nature and immaterial and irrelevant to the real issues raised for decision. Plaintiff’s testimony included considerable argument, and did not provide the basis for proper and relevant findings in addition to those already made herein.
V
37. (a) In his amended petition plaintiff alleged, inter alia, in substance and effect, that the acts of commission and omission of the PEB that met on March 25, 1963 (which proceedings were subsequently declared null and void), were prejudicial to later findings and recommendations made in his case by other boards and administrative bodies that subsequently considered and evaluated his physical condition, and deprived him of his right to a full and fair hearing; that the findings and recommendations contained in the reports of the PEB, PRC, and PDAB, dated June 6, June 18, and July 10, 1963, respectively, were erroneous, contrary to the evidence, and not supported by substantial evidence; that the action of the Secretary of the Army in ordering and causing him to be discharged from the Army, with severance pay, on July 18,1963, as then being unfit for further military service by reason of permanent physical disability rated at 10 percent disabling, and the decisions of the Correction Board sustaining and concurring in the action of the Secretary, and denying plaintiff’s several requests for correction of his military records to show that he was permanently retired from the Army by reason of permanent physical disability rated at 30 percent, were arbitrary, capricious, and *459 not supported by substantial evidence; and that at the time of his discharge, he was suffering from a permanent disability, incurred in line of duty, and disabled “to a definite degree” which made him unfit for further military service. In his prayer for relief, plaintiff asked that the court “return his name to the Army Eetired List through the Secretary concerned and allow him all retired pay due him.”
(b) In his pretrial submissions and briefs to the commissioner, plaintiff sharpens his position, and prayer for relief. He correctly points out that defendant, in its answer to his petition, admits that the Army found him to be permanently unfit for further military duty and disabled to a definite degree on July 18,1963, but he fails to mention that defendant further alleged that the degree of his disability was properly rated at 10 percent. Plaintiff argues that a disability of a “definite” degree calls for a disability rating of 30 percent under the YA Schedule. Plaintiff then specifically states that he seeks to be placed on the permanent retired roll of the Army, effective June 2,1963, and paid all pay and allowances due him from said date. In support of this said request for relief, plaintiff argues that under the provisions of 10 U.S.C. § 1210, supra,) the Secretary was required to make a final determination as to the degree of plaintiff’s disability and eligibility for disability retirement before the expiration of 5 years from the date he was placed on the TDRL; that since he was placed on the TDRL effective June 2,1958, such determination should have been made not later than June 1, 1963; and that as of said date his disability rating had been maintained at 30 percent for a full 5-year period. Plaintiff then appears to infer that since his said disability rating had not changed during this period and he was rated as 30 percent disabled at the end thereof, he was automatically entitled to disability retirement pay; and that the Secretary had no choice but to determine that the plaintiff was permanently unfit for further military service by l’eason of permanent physical disability rated at 30 percent disabling, and to place him on the permanent retired list, effective no later than June 2,1963.
(c) Defendant disagrees with plaintiff’s aforestated interpretation of the provisions of 10 U.S.C. § 1210, supra, and *460 argues that there is no basis in the language of said statute to support plaintiff’s inference, and contends that the action of the PEC in making recommended findings and recommendation, approved by the PDAB and the Secretary of the Army, that plaintiff be found physically unfit for further military service and subject to separation by reason of physical disability rated at 10 percent disabling was not arbitrary, capricious, contrary to the evidence, or unlawful; that plaintiff has failed to discharge his burden to show by clear and convincing evidence that the action of the Secretary of the Army in ordering and causing plaintiff to be discharged with a permanent disability rating of 10 percent on July 18, 1968, was arbitrary, capricious, contrary to the evidence, or unlawful; and that, therefore, plaintiff’s petition should be dismissed.
VI
Ultimate Findings and Conclusions
38. (a) Considering plaintiff’s long medical history of mental illness, beginning in August 1955 (finding 2, supra) ; the medical records covering periods he was hospitalized, the treatment received by him, and physical and special psychiatric examinations made by the Army and Veterans Administration, over the years from 1956 to 1963, particularly the findings and recommendations of the Army physician who examined plaintiff on January Y, 1963 (the last time he was actually examined prior to his discharge in July 1963), and the Medical Board that met on January 22, 1963 (finding 10), and the entire record, it is concluded as follows:
(1) The action of the PEB which met on June 6,1963, in finding that plaintiff had recovered from the condition for which he was originally placed on the TDEL and “may now be considered physically fit for service” (finding 12 (a) ), was unsupported by the evidence and absolutely ridiculous.
(2) The actions of the PRC (finding 13(a), supra), PDAB (finding 14(a)), and Secretary of the Army (finding 14(b), supra), were arbitrary, capricious, contrary to the evidence, not supported by substantial evidence, unfair, and inconsistent with the “reasonable doubt” policy rule set forth in the VA Schedule (finding 16 (b), supra). See, e.g., Brozik *461 v. United States, 180 Ct. Cl. 546 (1967); Cooper v. United States, 178 Ct. Cl. 277 (1967) (reasonable doubt rule); Harris v. United States, 177 Ct. Cl. 538 (1966); Powers v. United States, 176 Ct. Cl. 388 (1966).
(3) The actions and decisions of the Correction Board in failing to give plaintiff a hearing in the circumstances of this case, sustaining and concurring in the discharge action of the Secretary of the Army, and denying plaintiff’s applications for correction of his military records, were arbitrary, capricious, not supported by substantial evidence, and unf air. The Correction Board’s reliance, at least in part, on the VA disability ratings of plaintiff’s physical condition made in October 1958 (see findings 6(a) and 24(a) and (b), supra) was misplaced. In light of the facts set forth in finding 16(a), (b), and (c), supra, particularly, and that on October 20, 1965, the Board was put on notice by plaintiff that the VA had rerated his disability at 30 percent (finding 28, supra), the Board’s refusals to reconsider plaintiff’s requests for correction of his records constituted arbitrary action and abuse of discretion (see findings 29-31, supra). See, e.g., Brozik, Harris, Powers, all supra, and Merson v. United States, 185 Ct. Cl. 48, 401 F. 2d 184 (1968).
(4) Plaintiff’s actual physical (nervous) condition and the proper percentage of his disability as of June 1, 1963, when he had been on the TDRL for 5 full years and his disability retired pay was terminated, as well as at the time of his discharge from the Army on July 18, 1963, were essentially the same as determined by the VA on August 2, 1965, and shown in the letter to plaintiff dated August 3, 1965 (see findings 26(a) and 27(a), supra), i.e., in June and July 1963, as well as in 1965, plaintiff was permanently unfit for further military service by reason of permanent physical disability ratable at 30 percent disabling.
39. In the circumstances of this case, it is concluded and found that plaintiff is entitled to disability retired pay computed on the basis of 30 percent from and including June 2, 1963. This does not mean that the commissioner agrees with the argument and inference made by plaintiff in support of his request for relief (outlined in finding 37(b)). On the contrary, while the provisions of 10 U.S.C. § 1210 (finding 14(c) (4), supra), appear to contemplate that normally the *462 Secretary of .the service concerned will make certain final determinations with respect to the fitness and disability of a member of the service witlwn a period of 5 years after the member has been carried on the TDRL, and it is clear that under section 1210(h), ibid., the Army was required to terminate plaintiff’s disability retirement pay on June 1,1963, as it did (finding 14(d), supra), it is concluded from a reading of the provisions of Section 1210, supra, considered together, that the Secretary was not compelled to make final determinations as to plaintiff’s fitness and disability not later than June 1, 1963; and that the determinations actually made by 'him thereafter were not unlawful because such actions were taken later than said date. In other words, the Secretary was not required by law to place plaintiff on the permanent retired list of the Army, with a permanent disability rating of 30 percent, effective not later than June 2, 1963, simply by reason of the fact that as of June 1, 1963, he had been on the TDRL 5 years and then was deemed unfit for further military service because of a physical disability rated by the Army at 30 percent disabling without change from June 2, 1958. If the Secretary’s determination that on July 18, 1963, plaintiff was physically unfit for further military service by reason of a physical disability rated at only 10 percent was supported by substantial evidence (which it is not), then this court would have no reason to overrule the Secretary’s action separating plaintiff with severencepay.
The basis for the court’s conclusion and finding that plaintiff is entitled to recover disability retirement pay from and including June 2, 1963, is that the record considered as a whole shows that on said date plaintiff was, in fact, permanently unfit for further military service by reason of a permanent disability properly ratable at 30 percent; that despite plaintiff’s condition, he was retained on the TDRL, remaining a member of the Army from June 2, 1963 to July 18, 1963, without any disability retired pay or regular basic pay being given to him; and that the Army saw fit not to make plaintiff’s discharge retroactive to June 1, 1963. Since during the period June 2, 1963-July 18, 1963, plaintiff was not in an active duty status, was physically unfit to perform his military duties, and performed no such duties, he is not *463 entitled to recover active duty pay for this period. However, the record clearly shows that plaintiff was entitled to pay in some form or other during the period in question. Since the court has concluded that plaintiff was actually disabled with a disability rating of 30 percent as of June 1, 1963, as well as at the time of his actual discharge on July 18, 1963, it feels that he is entitled to permanent retired pay from and including June 2, 1963, forward. See Hamrich v. United States, 120 Ct. Cl. 17, 96 F. Supp. 940 (1951); Womer v. United States, 114 Ct. Cl. 415, 84 F. Supp. 651 (1949).
CONCLUSION op Law
Upon the foregoing findings of fact, ultimate findings and conclusions, and conclusions of law, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover disability retirement pay computed on the basis of 30 percent permanent disability from and including June 2, 1963, less the amount of severance pay paid to plaintiff, and less any disability compensation he may have received from the Veterans Administration since that date, and judgment is entered to that effect. The amount of recovery will be determined in further proceedings pursuant to Kule 131(c).

 In Nichols v. United States, 158 Ct. Cl. 412, 427 (1962), Army physical profile rating was concisely defined as follows:
“The letters In this rating system represent, ‘P’ for physique or general physical capacity or stamina, ‘U’ for upper extremities, ‘L’ for lower extremities, ‘H’ for hearing and ear defects, ‘H’ for eyes, and ‘S’ for neuropsychiatric. The tested individual is graded or rated 1 to 4 after each letter according to his functional ability in that physical category. Number 1 represents above average efficiency with at most a minimal defect; number 2 represents average efficiency with a mild, nonprogressive physical defect; number 3 represents below average efficiency with a moderate physical defect; and number 4 represents nonacceptable efficiency with a marked physical defect.”

 VA code No. 9004 is partially quoted in finding 16(d) infra, and reflects that tile PEB’s diagnosis most closely corresponded to the VA’s diagnosis of “Dementia Praecox.”

 VA Code No. 9005 is partially quoted in finding 16(d), infra, and reflects tiiat the Rating Board reported plaintiff’s condition as “Manic depressive psychosis” rather than “Dementia Praecox, mixed type” under VA Code No. 9004 (b) (also partially quoted in finding 16(d), infra), as found by the PEB on April 24, 1958 (finding 5(a), supra). As noted in finding 16(e), infra, VA Code No. 9204 was not used until the 9000 series of code numbers was discontinued effective October 1, 1961; therefore, it would appear that the number “9204” was not noted on the Rating Sheet until on or after said date.

 Although subsequent to the time of said ratings several amendments were made to Paragraph 29, Including, inter alia, one that became effective October 1, 1961 (see finding 16(e), infra, and particularly the last sentence of the quoted language set forth therein, which refers to “* * * paragraph 29, page 13-3R”), and another one that became effective March 1, 1963, such amendments did not change the wording of the parts of said paragraph quoted in the instant finding in any essential respects material to this case.

 Findings 32 and 33, respectively, show unsuccessful efforts made by plaintiff to obtain permanent, full-time federal employment during tbe period of time be was on the TDK.L, and after his discharge from the Army.

 Neither the provisions of the VA Schedule referred to and partially quoted in paragraphs (d) and (e) of the instant finding (16), nor the effective dates thereof, were introduced in evidence. Judicial notice has been taken of the same in order to make certain facts related thereto contained in this report more meaningful.

 This diagnosis most closely corresponds to the one recommended by the PBB and approved by the Secretary of the Army, as set forth in finding 5(a) and (b), supra.

 See NOTES (1) and (2) appearing under VA Code No. 9005 partially quoted, infra, and n. 10.

This VA Code number and the quoted material following the same are pertinent to the facts set forth in finding 6, supra. Also see n. 3.

 The above-quoted “NOTES (1)” and “(2)” also appeared In the VA Schedule following the provisions of No. 9004, partially quoted above.

 See finding 5 (b) and n. 4, supra.

 See findings 25 and 28, infra, which support plaintiff’s position that error was committed In his case and that he was misled In the course of the .Tune 6, 1068 PEB proceedings.